**John PUGLISI, Plaintiff,**

v.

**UNDERHILL PARK TAXPAYER ASSOC., Ron Gallo, Robert DeMeo, Marilyn Morgante, "John Doe" and "Jane Doe," Defendants.**

**John PUGLISI, Plaintiff,**

v.

**Richard CARROLL, Individually and as Building Inspector of the Village of Tuckahoe, Matthew A. Marino, Sheila R. Clarke and Jesse Nicotera, Individually and as Members of the Board of Trustees of the Village of Tuckahoe, and Philip A. White, Individually and as Mayor of the Village of Tuckahoe, Defendants.**

**Nos. 93 Civ. 8070(CBM), 94 Civ. 5754.**

United States District Court,
S.D. New York.

Nov. 12, 1996.

---

Loren Bailey, Brooklyn, NY, for John Puglisi.

Robert J. Ponzini, Maroney Ponzini & Spencer, Tarrytown, NY, for Underhill Park Taxpayers Association, John Doe, Jane Doe.

Michael A. Miranda, Thurm & Heller, New York City, for Richard Carroll.

## OPINION

MOTLEY, District Judge.

### I. Background.

This action arises out of a dispute between plaintiff and defendants' Underhill Park Association ("Underhill Defendants") an alleged association comprised of members Ron Gallo, Robert DeMeo, Marilyn Morgante, "John Doe" and "Jane Doe" and defendants' Richard Carroll, individually and as Building Inspector of the Village of Tuckahoe; Matthew A. Marino, Sheila R. Clarke and Jesse Nicotera, individually and as members of the Board of Trustee of the Village of Tuckahoe; and Philip A. White, individually and as Mayor of the Village of Tuckahoe ("Village Defendants"), regarding plaintiffs' premises at 56 Underhill Street in the Village of Tuckahoe, the upkeep of said property and plaintiff's rights concerning the rental of the premises to African American tenants.

Between March, 1991 and July, 1991, plaintiff rented his three family house at 56 Underhill Street, Tuckahoe, New York to three African–American families. He alleges that defendant DeMeo threatened, coerced, and intimidated him by stating to him that plaintiff "should not be renting to *niggers* because it decreases property value in the neighborhood." Complaint ¶ 12. Thereafter, plaintiff contends that the individual Underhill defendants formed the unincorporated association, Underhill Park Taxpayer Association ("Association"), for the purpose of meeting, combining and conspiring to remove the African–American tenants from plaintiff's house and, hence, the neighborhood. About August, 1991, plaintiff claims that he was invited to attend a meeting of the Association in which each Underhill defendant was present. At the meeting, plaintiff alleges that he was informed of the unanimous opposition by the Association's members to plaintiff's renting to the African American tenants. Plaintiff alleges he was told to evict the African American tenants and was threatened with retaliatory measures if he did not. He states in his complaint that he refused to evict the tenants.

As a result of his refusal, plaintiff alleges that the Underhill defendants conspired to cause false complaints to be filed against him with the Village of Tuckahoe for violating Village codes, laws and regulations. As part of the conspiracy, plaintiff alleges that defendants acting together, jointly and severally, caused a complaint to be filed alleging that he was operating an illegal boarding house and painted or caused to be painted the word "NIGGER" on the front of plaintiff's premises at 56 Underhill Street, Tuckahoe, New York. Plaintiff alleges that defendants' acted with the desire and intention of forcing the eviction and removal of the African American tenants, actions which plaintiff claims are in violation of his right to be free from coercion, intimidation and interference with respect to the exercise of his rights protected by the Federal Fair Housing Act of 1968 and various Civil Rights Acts.

In addition, plaintiff alleges that the Village defendants, through the actions of their agents, employees, or assigns, acting under the color and authority of state law, had knowledge of and combined in the aforesaid conspiracy to force the removal of the African American tenants by harassing plaintiff. Between July 1991 and September 1991, plaintiff claims the Village defendants' or their assigns received complaints from residents of the Underhill Street area that plaintiff had rented his premises at 56 Underhill Street to African Americans. Around this time, defendants' agents or assigns allegedly met with representatives of the Association and were informed of the Association's discontent with the race of the new tenants. He claims that the Village defendants, particularly through defendant Carroll, caused or authorized the various complaints to be filed and, more specifically, the summonses to be issued by the Village of Tuckahoe alleging that plaintiff operated the illegal boarding house.

Plaintiff alleges that because the Village of Tuckahoe and its agents and assigns had knowledge of the Associations' actions and intentions, the Village defendants aided in the conspiracy and retaliatory measures of the Association by neglecting or failing to prevent said actions. Plaintiff argues that his cause of action against the Village defendants arises out of their having acted acting under color and authority of state law to deny him the right to contract and rent his premises free from racial consideration and to deny him equal protection of the laws. Plaintiff alleges that both the Underhill defendants and the Village defendants are, jointly and severally, guilty of depriving him of his civil rights, loss of income, mental anguish, pain and humiliation.

## II. Procedural History and Present Status of the Case.

On November 23, 1993, plaintiff commenced an action against defendant, Underhill Park Taxpayer Association, naming as its members, Ron Gallo, Robert DeMeo, Marilyn Morgante, and others unknown to the plaintiff identified respectively as "John Doe" and "Jane Doe", charging them with violating the Civil Rights Acts, as amended, 42 United States Code Sections 1981, 1982, 1985(3); Title VIII of the Civil Rights Act of 1968, as

amended, 42 U.S.C. sec. 3601, *et seq.*, ("Fair Housing Act").

On January 20, 1994, plaintiff submitted to the Clerk of the Court a request to enter a default judgment against the Underhill defendants for failure to plead, answer, appear, or make a motion with respect to plaintiff's summons and complaint which plaintiff, by affidavit, states was served on each individual defendant. *See* Declaration in Support of Default. On January 28, 1994, this court entered a default judgement against the Underhill defendants pursuant to Rule 55(a).[1] By Order, the court then scheduled and later held an inquest on the issue of damages on September 16, 1994.

On August 8, 1994 plaintiff commenced a similar action against Richard Carroll, individually and as Building Inspector of the Village of Tuckahoe, Matthew A. Marino, Sheila R. Clarke and Jess Nicotera, individually and as members of the Board of Trustees of the Village of Tuckahoe and Philip A. White, individually and as Mayor of the Village of Tuckahoe ("Village defendants") charging the defendants with violating the same statutes. On November 15, 1994, the Village defendants submitted a motion requesting a change of venue from this Court[2] to the Southern District of New York, White Plains Division, on the grounds that each of the named defendants were residents of the Village of Tuckahoe and were sued in their official capacities with the Village of Tuckahoe; that the premises, at 56 Underhill Street, was located in the Village of Tuckahoe; that each of the litigants resided and the cause of action arose in Westchester County, that Tuckahoe was 15 minutes from the White Plains Courthouse; and that the case was originally filed in the White Plains Division of the Southern District but was later transferred to this Court due to the filing of the related action, *Puglisi v. Underhill Taxpayers Association, et al.*, at Foley Square.

This court denied defendants' motion and subsequent motions to transfer venue. Pursuant to the Village defendants' initial motion to transfer the case to the White Plains Division, plaintiff filed a cross-motion for sanctions against defendants for signing and filing the motion to transfer in violation of Rule 11 of the Federal Rules of Civil Procedure[3] and requested attorney's fees for having to defend the motion.

On September 29, 1994, the Underhill defendants filed a Motion to Vacate the Default Judgment entered against them, alleging that service was not proper. Finally, on November 23, 1994, this court granted the Underhill Defendants' motion to vacate the default judgement, denied plaintiff's counsel's motion for attorney's fees without prejudice to renewal at the end of the case, consolidated both cases, and set a date for the exchange of documents and for the production of a schedule for depositions of all witnesses.

On September 21, 1994, the Village defendants filed an answer to plaintiff's complaint denying all of plaintiff's allegations, except as to Matthew A. Marino, Sheila R. Clarke and Jesse Nicotera being members of the Board of Trustees of the Village of Tuckahoe, Philip A. White being Mayor of the Village of Tuckahoe, and Richard Carroll being the Building

---

1. Rule 55(a) reads, "when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed.R.Civ.P. Rule 55(a).

2. When defendants filed this motion, the court was located in the Southern District of New York at Foley Square, New York, New York. The court has since been moved to 500 Pearl Street, a building adjacent to the Foley Square Courthouse.

3. Rule 11 states in part "By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, ... the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law ..." Fed.R.Civ.P. Rule 11(b)(2). Plaintiff argued that the defendants filed the motion to transfer in bad faith and without any substantial legal basis because they knew that the issue was not one of venue but rather an issue of "Division of Business Among District Judges" pursuant to Rule 22, the rule defendants relied upon in their motion. *See* Plaintiff's Cross Motion for Sanctions Pursuant to F.R.C.P. Rule 11.

Inspector of the Village of Tuckahoe. Defendants raised several affirmative defenses, including that plaintiff lacked standing to bring the action and failed to set forth facts by which a claim could be made, alleging that defendants acted, with respect to the premises owned by plaintiff at 55 and 56 Underhill Avenue, in accordance with all applicable rules, regulations and mandates of the Constitution and the State of New York and in good faith and in reasonable performance of their official duties. Likewise, on December 2, 1994, the Underhill defendants filed an answer to plaintiff's complaint denying all of plaintiff's allegations and raising the same affirmative defenses as the Village defendants as to lack of standing and failure to state facts upon which a claim could be made.

On May 15, and June 5, 1996, pursuant to FRCP Rule 12(b) [4] and (h)(3) [5], the Underhill defendants and the Village defendants each filed separate motions to dismiss for lack of subject matter jurisdiction, arguing that plaintiff's complaint failed to establish "standing to raise the claims under the Fair Housing Act, Sections 1981 and 1982 of the Civil Rights Act." Alternatively, in the event the court granted standing, the defendants requested that the court grant their motions for summary judgement [6] due to plaintiff's failure to produce evidence sufficient to establish a genuine issue warranting a trial on such claims.

Plaintiff's memorandum of law in opposition to defendants' motion for summary judgment conceded that standing was required to bring a justiciable claim before the court but argued that the Supreme Court requires a plaintiff to show only that he "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," citing *Valley Forge Christian*

*College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) in support of his position. Plaintiff cites this case to support his argument that due to his personal economic, emotional, and mental injury, he has satisfied the standing requirement which imports justiciability to the federal courts.

Following a hearing on defendants' motion for summary judgment on September 26, 1996, this court held that plaintiff did have standing to bring several of his Civil Rights and Fair Housing Act claims; however, the court, nevertheless, dismissed plaintiff's complaint, granted defendants' motion for summary judgment and informed the parties that this opinion on the motions would follow.

For the reasons discussed herein, this court finds and concludes that plaintiff meets the standing requirement for his §§ 1981, 1982, 1983, and 3617 claims but does not meet the standing requirements to bring his § 1985(3) claim. Moreover, although plaintiff satisfies the standing requirement for the above noted claims, defendants' motion for summary judgement is still granted due to plaintiff's failure to establish by sufficient evidence a material issue warranting trial.

### III. Standing.

In this case, plaintiff alleges in his complaint that the Village defendants have deprived him of his right to equal protection of the laws in violation of § 1983 and that both defendants have denied him his right to contract in violation of § 1981, his right to equal housing opportunity in violation of § 1982 and the Fair Housing Act, § 3601, *et seq*, his right to exercise rights protected by the Fair Housing Act, § 3601 *et seq*, and §§ 1981, 1982, in violation of Sec. 1985(3),

**4.** Rule 12(b) states in part that ... "Every defense, in law or fact, to a claim for relief in any pleading, ... shall be asserted in the responsive pleading thereto if one is required except that the following defenses may at the option of the pleader be made by motion ... (1) lack of jurisdiction over the subject matter." Fed.R.Civ.P. Rule 12(b)(1).

**5.** Rule 12(h)(3) states that "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the

court shall dismiss the action." Fed.R.Civ.P. Rule 12(h)(3).

**6.** Although defendants filed the Motions to Dismiss for Lack of Subject Matter Jurisdiction with their Motions for Summary Judgment and plaintiff's Reply in Opposition to the Motion to Dismiss is labeled as the 'Reply in Opposition to the Motion for Summary Judgment', the court considers the motion to dismiss and the motion for summary judgment separately.

and, lastly, his right to be free from coercion or intimidation in the exercise of rights protected by the Fair Housing Act, § 3601 *et seq*, in violation of § 3617. Plaintiff maintains that these statutes provide him with the legal rights and interests sufficient to withstand the prudential principles by which the court determines standing. Plaintiff claims that in as much as these statutes vest an interest and legal right in him, he is entitled to judicial relief for defendants' alleged actions that have encroached upon his rights.

Defendants' main contention is that plaintiff, a non-minority, does not have standing to bring these claims of racial discrimination against minorities because the statutes pursuant to which plaintiff asserts his claims do not vest such a right in him and therefore, defendants maintain that plaintiff's complaint is essentially an attempt to assert these claims on behalf of his African American tenants which is prohibited by the statutes and the requirements of standing.

Article III of the Constitution restricts federal court jurisdiction to "cases and controversies." U.S. CONST. art. III § 2. The Supreme Court has ruled that unless a plaintiff or petitioner can demonstrate the requisite 'case or controversy' between himself, personally, and defendant's actions, plaintiff can not seek relief. *Warth v. Seldin,* 422 U.S. 490, 502, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In order for plaintiff to bring a case in federal court, the complainant must establish standing, which satisfies the "cases and controversy" requirement, by alleging and showing "that [s]he has sustained or is in immediate danger of sustaining a direct injury as a result of that action", *Ex Parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1 (1937), of which [s]he is complaining. The injury must be "sufficiently real and immediate", *Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S.Ct. 2777, 2783, 73 L.Ed.2d 534 (1982) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)), as opposed to merely " 'conjectural' or 'hypothetical' ", *O'Shea,* 414 U.S. at 494, 94 S.Ct. at 675. The standing question turns on whether plaintiff "has alleged such a personal stake in the outcome of the controversy as to warrant invocation of federal court jurisdiction and to

justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin,* 422 U.S. at 498, 95 S.Ct. at 2205, 45 L.Ed.2d at 354. In *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), an environmental group brought an action against the United States and the Interstate Commerce Commission, in the United States District Court for the District of Columbia, seeking a preliminary injunction to restrain enforcement of the Commission's orders allowing railroads to collect a 2.5% surcharge. SCRAP was an unincorporated association formed for the purpose of enhancing the quality of the human environment for its members and all citizens. On the issue of whether these plaintiffs had standing to bring their cause of action, the Court reasoned that the party seeking relief must be among those injured, "for it is this requirement that gives a litigant a direct stake in the controversy and prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders". *Id.* at 687, 93 S.Ct. at 2416.

The Supreme Court has also ruled that injury sufficient to meet the standing requirement includes economic and non-economic injury. In *Association of Data Processing Service v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), plaintiffs, sellers of data processing services to businesses, challenged a ruling by the Comptroller of the Currency of the United States to allow national banks to provide data processing services to other banks and its customers. The Court ruled that plaintiff successfully established that the challenged action had caused him injury in fact, economic or otherwise, in that plaintiffs may suffer some future loss of profits from the competition of the national banks. The Court, in highlighting, both economic and non-economic injury noted: "we mention these non economic values to emphasize that standing may stem from them as well as from the economic injury on which petitioners rely here." *Id.* at 154, 90 S.Ct. at 830, 25 L.Ed.2d at 188. *See also Mackey v. Nationwide Insurance Companies,* 724 F.2d 419 (4th Cir.1984) (court held that black insurance agent claiming loss of commission income due to insurers alleged

redlining practices met the constitutional requirement of standing).

One further preliminary issue requiring discussion is the standard courts are to apply in determining motions to dismiss for lack of standing. In *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206–2207, 45 L.Ed.2d at 356, the Supreme Court held;

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.

*Id.* "Although standing in no way depends on the merits of the plaintiff's contention that the particular conduct complained of is illegal," *Id.* at 500, 95 S.Ct. at 2206, 45 L.Ed.2d at 355; *See also Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968), plaintiff must allege facts from which it may be reasonably inferred that he was or could have been injured in fact by the conduct, if the allegations were proved at trial. "Pleadings must be more than an ingenuous academic exercise in the conceivable [injury] ... by the challenged agency action ... It is equally clear that the allegations must be true and capable of proof at trial." *United States v. SCRAP,* 412 U.S. at 688–689, 93 S.Ct. at 2416.

The Second Circuit has extended the Supreme Court's ruling on the standard and procedure District Courts should follow in deciding a motion to dismiss for lack of standing. In *Alliance of American Insurers v. Cuomo,* 854 F.2d 591 (2d Cir.1988), the court held that under certain circumstances, the District Court should afford plaintiffs an opportunity to take limited discovery and justify their claim of justiciability at a hearing and reasoned that failure to do so can be held an abuse of discretion. *Id.* at 596 (citing *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1011 (2d Cir.1986)); *See Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir.1981) *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (where the facts supporting jurisdiction are complicated, discovery and taking testimony is advisable before a court grants a motion to dismiss for lack of jurisdiction); *See also United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (where plaintiff alleges a specific and perceptible harm which defendants dispute, the proper course is for defendant to move for summary judgment on the issue of justiciability and demonstrate to the court that no genuine issue of fact exists).

With these general considerations in mind, the court turns to this case to analyze the issues of standing in view of Article III restraints placed upon this court and the standard this court must apply in ruling on defendants' motion to dismiss for lack of standing. In this case, defendants moved the court to dismiss plaintiff's claim for lack of standing on the grounds that plaintiff is a Caucasian male attempting to bring a racial discrimination action on behalf of his African American tenants. In the event standing is granted, defendants have disputed most, if not all, of plaintiff's factual allegations and, pursuant to the law of this Circuit, properly moved this court to grant a motion for summary judgment which the court granted and is discussed in this opinion below.

This court held a hearing at which plaintiff was given an opportunity to establish standing before the court ruled on the pending motion. Plaintiff (in his Reply Memo Opposing the Motion for Summary Judgment and on the hearing) argued that he, himself, was injured by the racially discriminatory practices of the defendants because they were aimed and executed against him. Plaintiff cited the alleged incident in which defendant DeMeo approached him in an intimidating manner and told him that he should not be renting to *niggers,* and alleged that defendants engaged in actions that prevented him from renting to African Americans and from exercising his rights as a property owner and landlord.

In both complaints, plaintiff alleged suffering loss of reputation, mental anguish, pain

and humiliation. *See* Underhill Complaint ¶ 25 and Plaintiff Complaint ¶ 20. In addition, at the hearing, plaintiff alleged that he lost profits from renting to the African American tenants due to the actions of the Underhill and Village defendants which purportedly forced the eviction of his tenants. Plaintiff alleges that he suffered financially because he had to expend a substantial amount of money to make the necessary repairs on his premises for the conditions the Village defendants noted as code violations and selectively enforced against him due to the race of his tenants and had to pay for an attorney to represent him in criminal actions taken against him in the Village Justice Court because of such violation.

This court finds that even if it did not consider the factual allegations offered at the hearing, there is no doubt that Plaintiff has met the Article III requirements for standing. Since standing does not turn on the merits of plaintiff's contention of illegal conduct and taking the allegations in the complaint as true, the court accepts as true for purposes of determining standing, the allegations of both complaints.

The court finds it reasonable to infer from the factual allegations that plaintiff suffered a personal injury from defendants' alleged actions. Based on the allegations and complaint, plaintiff has shown that he has a personal stake in the outcome of the controversy due to both his economic and non-economic injury. Hence, plaintiff has satisfied the constitutional requirement of standing.

### A. Prudential Limitations on Standing

The Supreme Court has ruled that the constitutional requirement is only the minimum mandate that a plaintiff must meet to invoke the court's decisional and remedial powers. In a series of decisions, the Court has noted that the federal judiciary adheres to a set of prudential principles that bear on the question of standing. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Gladstone Realtors v. Village of Bell-*

*wood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Valley Forge College v. Americans United*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Even when a case falls within the constitutional boundaries of the 'case or controversy' requirement, a plaintiff may still lack standing under the prudential principles "by which the judiciary seeks to limit access to the federal courts to those litigants best suited to assert a particular claim," *Gladstone*, 441 U.S. at 99–100, 99 S.Ct. at 1608.

The Court has ruled that prudential principles prohibit plaintiff from asserting generalized grievances or abstract questions of wide public significance and limit plaintiff to asserting only his own legal interests or rights and not the legal rights or interests of third parties. In *Warth*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343, the Court reasoned that actual or threatened injury required by Article III may exist solely by statutes creating legal rights, the violation of which establishes standing. These statutes become critical, apart from Article III minimum requirements, because they "properly can be understood as granting persons in the plaintiff's position a right to judicial relief ... and assumes critical importance with respect to the prudential rules of standing...." *Id.* at 490, 500, 95 S.Ct. at 2200–2201, 2206, 45 L.Ed.2d at 343, 355–356. Plaintiff's complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing*, 397 U.S. at 153, 90 S.Ct. at 830, 25 L.Ed.2d at 188; *See also Valley Forge College*, 454 U.S. at 475, 102 S.Ct. at 760.

Because defendants make a general attack on plaintiff's standing to bring the various claims without distinguishing between them and without asserting separate arguments for each, the court will discuss the general principles of each of plaintiff's Civil Rights and Fair Housing Act claims to determine whether plaintiff's complaint falls within the 'zone of interests' protected and regulated, thereby satisfying the Court's prudential considerations of standing.

## 1. Section 1981 and Section 1982

The issue in the present case is whether Sec. 1981 [7] and 1982 [8] vest rights in Plaintiff to bring this racial discrimination claim, the violation of which would impart standing to him thereby satisfying the additional limitations of the prudential principles applied by federal courts in standing questions. The Second Circuit has provided a foundation for discussing the general principles of § 1981 and § 1982. On § 1981, the Court notes;

> "the statute has long been viewed as prohibiting certain forms of discrimination based on race, *see, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 369, 374, 6 S.Ct. 1064, 1070, 1073, 30 L.Ed. 220 (1886), and its reference to rights enjoyed by white citizens establishes the 'racial character of the rights being protected,' *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 293, 96 S.Ct. 2574, 2585, 49 L.Ed.2d 493 (1976) (quoting *Georgia v. Rachel*, 384 U.S. 780, 791, 86 S.Ct. 1783, 1789, 16 L.Ed.2d 925 (1966)).

*Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988). Moreover, the court, in *DeMatteis v. Eastman Kodak Company*, 511 F.2d 306 (2nd Cir.1975), holds that sections 1981 and 1982 of Title 42 are both derived from section 1 of the Civil Rights Act of 1866 reenacted after adoption of the Fourteenth Amendment. Therefore, words which are common to both those sections, therefore, must be construed consistently. *Id.* at 312.

Furthermore, in accordance with the understanding of the drafters of the civil rights statutes, courts have interpreted race to include 'white' and have asserted that standing under these statutes is not denied because the plaintiff is white. In *Clifton Terrace Associates v. United Technologies Corp.*, 728 F.Supp. 24 (D.D.C.1990), the court cites many supporting cases when it asserts that "as a threshold matter, the fact that plaintiff is a business owned and operated by white individuals does not bar it from bringing a civil rights action in federal court." *Id.* at 31. *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (court held that white employee discriminated against has standing to bring civil action); *See also Des Vergnes v. Seekonk Water Dist.*, 601 F.2d 9 (1st Cir.1979), vacated on other grounds, 454 U.S. 807, 102 S.Ct. 81, 70 L.Ed.2d 76 (1981).

Courts have extended the coverage of the statutes beyond state action to reach and include unofficial acts of private individuals that also violate the statutes. *See Sullivan v. Little Hunting Park*, 396 U.S. 229, 235, 90 S.Ct. 400, 403–404, 24 L.Ed.2d 386, 392 (1969). Lastly, in interpreting the requirements of standing for legal claims under these sections, the courts have reasoned that "prudential limitations on standing ordinarily require that an action under section 1981 or 1982 be brought by the direct victims of the alleged discrimination because they are best situated to assert the individual rights in question." *Clifton Terrace Associates v. United Technologies Corporation*, 929 F.2d 714, 721 (D.C.Cir.1991); *See Sterngass v. Bowman*, 563 F.Supp. 456 (S.D.N.Y.1983) (court ruled that in actions commenced under the civil rights statutes, plaintiffs may only sue for deprivation of their own constitutionally and federally protected rights and not the rights of others); *See also Javits v. Stevens*, 382 F.Supp. 131 (S.D.N.Y.1974). Therefore, a plaintiff, generally, cannot commence an action based on the rights of others or on behalf of the rights of third parties.

Turning to this case, plaintiff accuses defendants, who are both private individuals and public officials, of violating his rights. He alleges that the discrimination was due to race, not his race but the race of his tenants and that the racial discrimination caused him harm as a result. Defendants staunchly ar-

---

7. Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens ...". 42 U.S.C. § 1981.

8. Section 1982 provides that "all citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." Id § 1982.

gue that plaintiff, given the case law, does not satisfy standing because he is not a member of the class the statutes were meant to protect, that is those discriminated against because of their race and maintains that any attempt to separate the injury to the plaintiff and injury to the African American tenants fails because the alleged discriminatory activities were targeted against and motivated by racial animus against the tenants, the direct victims. Therefore, defendants argue that plaintiff is trying to bring these claims on behalf of the direct victims, his African American tenants.

Defendants cite this courts opinion in *Hotel St. George Associates v. Morgenstern,* 819 F.Supp. 310 (S.D.N.Y., 1993), as the precedent case on this issue. In that case, a hotel association brought an action under §§ 1981 and 1982, on behalf of it's black and latino HIV and AIDS infected tenants against individual members of community organizations for civil rights violations arising from the organizations' efforts to limit the number of black and latino HIV and AIDS infected individuals who reside on the premises. "The plaintiff's complaint alleged that defendants' letters and communications with various city and civic organizations were a campaign of harassment and intimidation that was motivated by racial bias against the predominantly Black and Latino residents of the Hotel because defendants action allegedly resulted in a cap of 65 AIDS and HIV positive residents being set." *Id.* at 317. This Court held that the Association, itself, had not been discriminated against on the basis of race or sex within the terms of 42 U.S.C. Sec. 1981 and 1982. The harm to the Association, if any, occurred because plaintiff had rented to blacks and latinos with AIDS.

In this action, as defendants point out, Plaintiff makes similar allegations in his complaint as those alleged by plaintiff in *Hotel St. George,* alleging that the Underhill defendants filed Village code violations and false complaints of fire and zoning violations against plaintiff. Plaintiff asserts that the Underhill defendants caused to be issued by the Village defendants a false summons claiming plaintiff operated an illegal boarding house. He maintains that the actions of the defendants were intended to force him, the landlord to evict the African Americans,

thereby violating his rights. In his complaint, he implies that the false complaints and harassment did not begin until he rented his premises to the African American tenants.

Defendants would have the court rule, in the present case, that, in essence, like the *Hotel St. George* defendants, defendants' alleged actions were motivated by racial bias against plaintiff's tenants due to the tenants' race and that defendants' actions were ultimately intended to force the eviction of the African American tenants. Therefore, plaintiff should be barred from bringing this claim because the tenants were the direct victims of the alleged discriminatory practices. Any attempt by plaintiff, directly or indirectly, to base his claim on the rights of his tenants is insufficient for standing. Defendants point to *Hotel St. George* where this court held that "neither the federal statutes nor the New York statutes provide a cause of action for a property owner or provider of services against members of the community on behalf of residents or potential residents." 819 F.Supp. at 318.

However, there is a clear distinction between *Hotel St. George* and the case before the court which defendants fail to realize. In *Hotel St. George,* there is no indication that the hotel was alleging injury on its own behalf but was clearly trying to bring the claim *on behalf of* its black and latino HIV and AIDS infected tenants, the direct victims of the alleged discriminatory actions. In the opinion, the court notes: "plaintiff in its complaint attempted to assert the rights of Black and Latino residents and potential residents," *Id.,* which this court rejected. *See also National Organization For Women v. Sperry Rand Corp.,* 457 F.Supp. 1338, 1347 (D.Conn.1978) (citing *Wisconsin NOW v. State of Wisconsin,* 417 F.Supp. 978, 982 (W.D.Wis.1976)) (court rejected white plaintiff's attempt to raise the rights of blacks because there was no allegation of injury to herself).

Here, in plaintiff's complaint he alleges that he, himself, as a landlord, is a direct victim of defendant's actions in that he personally has been intimidated, attacked, and threatened and is, therefore, best suited to

bring the claim. Because of this clear distinction between the *Hotel St. George* and the plaintiff in this case alleging his own injuries stemming from the racial discrimination targeted at his minority tenants, the court cannot look solely to that case to decide this issue. Further analysis is required.

Plaintiff does not allege that he is a member of the class directly protected by the civil rights provisions but instead alleges that he suffered injuries that stemmed from discrimination against his African American tenants, who as African Americans, are members of a protected class. The issue before the court then is whether plaintiff has standing to sue under these statutes for indirect or derivative injury suffered by him, a non minority, as a result of discrimination aimed at African Americans. The Supreme Court has held that "in some circumstances, countervailing considerations may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties ... In such instances, the Court has found, in effect, that the constitutional or statutory provision in question implies a right of action in the plaintiff." *Warth*, 422 U.S. at 500–501, 95 S.Ct. at 2206, 45 L.Ed.2d at 356 (citing *United States v. Raines*, 362 U.S. 17, 22–23, 80 S.Ct. 519, 523–524, 4 L.Ed.2d 524 (1960); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Sullivan v. Little Hunting Park Inc.*, 396 U.S. 229, 237, 90 S.Ct. 400, 404–405, 24 L.Ed.2d 386 (1969)).

An analysis of standing in the case before the court must begin with *Sullivan*, the seminal case on this issue. In that case, the Supreme Court upheld the standing of a white plaintiff to sue under § 1982 for injuries deriving from discrimination against an African American man. Sullivan, the plaintiff, a white man, was a member of defendant's corporation which operated a community park and playground for the benefit of its members, residents in the neighboring area. If a member leased his home, he could assign his membership to the tenant subject to approval from the corporation board. Sullivan bought another home in the same area and leased his first house, along with its membership rights in the park corporation, to Freeman, an African American man. The corporation objected to the assignment because the tenant was black and when Sullivan protested, both were expelled from the membership. Sullivan and Freeman sued the corporation pursuant to §§ 1981, 1982.

The Court concluded that because Little Hunting Park was a residential area open to whites and based its selection criteria only on race, the denial of the black lessee's and white plaintiff landlord's agreement was a "device functionally comparable to a racially restrictive covenant." *Id.* at 236, 90 S.Ct. at 404, 24 L.Ed.2d at 392. Furthermore, the Court, in discussing only § 1982, held that plaintiff, Sullivan, had standing to sue for his own expulsion from the corporation:

> We turn to Sullivan's expulsion for the advocacy of Freeman's cause. If that sanction, backed by a state court judgment, can be imposed, then Sullivan is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. That is why we said in *Barrows v. Jackson*, 346 U.S. 249, 259, 73 S.Ct. 1031, 1036, 97 L.Ed. 1586 (1953), that the white owner is at times "the only effective adversary" of the unlawful restrictive covenant. Under the terms of our decision in *Barrows*, there can be no question but that Sullivan has standing to maintain this action.

396 U.S. at 237, 90 S.Ct. at 404, 24 L.Ed.2d at 392–393.

Although the actions and circumstances, in this case, surrounding Plaintiff's allegations do not amount to a racially restrictive covenant, one of the deciding factors in *Sullivan*, the court upholds plaintiff's standing under both § 1982 and § 1981 on the theory that the non-minority plaintiff here has been personally injured for attempting to vindicate the rights of his tenants as alleged in his complaints.

*Sullivan* has generated a long line of cases extending standing under the other Reconstruction Civil Rights Statutes to non minorities seeking a remedy for injuries incurred by discrimination targeted against a protected minority class. Although *Sullivan* did not

explicitly extend its holding that non minorities may sue for injuries incurred for trying to vindicate the rights of minorities to actions under § 1981, lower courts have done so. The first such case in this Circuit was *DeMatteis v. Eastman Kodak Co.*, 511 F.2d 306 (2d Cir.1975), *reh'g denied,* 520 F.2d 409 (2d Cir.1975) in which the Second Circuit upheld standing for a white man who sued under § 1981, alleging that his employer had forced him into retirement because he sold his house, located in a neighborhood inhabited primarily by white Kodak employees, to a black fellow employee. In referring to *Sullivan* when discussing standing under § 1981, the court noted:

> the Supreme Court held that 'Sullivan has standing to maintain this action.' 396 U.S. at 237, 90 S.Ct. at 404, 24 L.Ed.2d at 393. Although the Court referred explicitly to s 1982 in setting out the rationale for its position, see 396 U.S. at 237, 90 S.Ct. 400, 24 L.Ed.2d at 392–393, it did not limit its holding on the standing issue to that section of the Civil Rights Act. We need not rest upon the Supreme Court's disposition of the s 1981 claim in Sullivan v. Little Hunting Park, however, in holding as we do, that a white person who has suffered injury to some legally cognizable interest as a result of '... trying to vindicate the rights of (non-white) minorities ...' has standing to sue for a violation of 42 U.S.C. s 1981. Consistency ... requires that white persons be accorded standing to sue under both s 1981 and s 1982 in circumstances similar to those present in Sullivan.

511 F.2d at 312; *See also Albert v. Carovano,* 851 F.2d 561, 572 (2nd Cir.1988) (under certain circumstances, a non minority plaintiff may sue pursuant to § 1981 when someone retaliates against him because he did not engage in purposeful discrimination).

Additionally, other Circuit Courts have extended standing under § 1981. In the Fifth Circuit, the court granted standing to a white man bringing a claim pursuant to § 1981 because he had not been hired by defendant because his wife was black. *Faraca v. Clements,* 506 F.2d 956 (5th Cir.1975); *Goff v. Continental Oil Company,* 678 F.2d 593, n. 7 (5th Cir.1982) (court held that white people can assert civil rights claims when someone harms them due to discrimination against blacks). The Sixth Circuit extended *Sullivan* to § 1981 in *Winston v. Lear–Siegler Inc.,* 558 F.2d 1266 (6th Cir.1977), a case in which a white employee was fired for protesting the racially discriminatory firing of a fellow black employee by holding that "although [plaintiff] was not fired because of his race, it was a racial situation in which he became involved that resulted in his discharge." *Id.* at 1268. Furthermore, the First Circuit in reviewing *Sullivan, DeMatteis, Faraca* and *Winston,* held that:

> [t]hose cases stand for two propositions: to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination ... [w]e conclude that, in order to effectuate the public policy embodied in § 1981, and in order to protect the *legal rights* of non-whites expressly created by § 1981, a person has an implied *right of action* against any other person who, with a racially discriminatory intent, interferes with his right to make contracts with non-whites. *A fortiori* a person has an implied *right of action* against any other person who, with a racially discriminatory intent, injures him because he made contracts with non-whites.

601 F.2d at 14 (original emphasis).

In the present case, Plaintiff alleges that he was invited to a meeting and was told of the Underhill defendants' disapproval of his African American tenants. When instructed to evict the tenants, plaintiff alleges that he refused and was thereby informed that he would suffer the repercussions of his decision. He asserts that the Underhill defendants together with the Village defendants engaged in numerous harassing activities in an attempt to force the tenants to leave the neighbor which were very costly and taxing on him financially and mentally. In accordance with the case law cited above, this court finds that Plaintiff has an implied right of action to bring this action challenging the

alleged racially discriminatory actions of the defendants that resulted in injury to him.

The court notes however that some Circuit Courts have barred these claims by non minority plaintiffs when it is shown that these non minority plaintiffs are not the 'only effective advocates', citing the rationale of the Supreme Court in both *Barrows* and *Sullivan*. The United States Court of Appeals for the District Court of Columbia in *Clifton Terrace Associates, Limited v. United Technologies Corporation, et al.*, 929 F.2d at 714, refused standing to an owner of a federally subsidized low-income housing complex bringing an action pursuant to §§ 1981 and 1982 against an elevator manufacturer who allegedly refused to provide services because of the race of his tenants. The court denied standing based on the fact that the tenants were the direct victims and were plainly identifiable; therefore, the court · concluded that plaintiff did not need to be granted standing to vindicate the rights of its tenants when they themselves could have brought the action against defendant.

Likewise, in the Fourth Circuit, in *Mackey v. Nationwide Insurance Companies*, 724 F.2d 419 (4th Cir.1984), the court, in denying plaintiff standing, reasoned that defendant insurance company would not be insulated from prosecution for its alleged racially discriminatory refusal to issue insurance to black neighborhoods, if plaintiff was denied standing to bring his §§ 1981, 1982 actions, alleging only that he lost an opportunity to sell property insurance to black friends and acquaintances due to defendant's actions. The court found that those blacks being denied insurance could bring the suit against defendants themselves. *Id.* at 420. Lastly, in interpreting *Sullivan,* the Ninth Circuit in *Halet v. Wend Investment Co.*, 672 F.2d 1305 (9th Cir.1982), refused to extend standing to a white man suing for racial discrimination under §§ 1981, 1982, 1983 and alleging that an apartment complex's policy of "adults-only" violated his right to live with his family and was racially discriminatory, since it impacted minorities more than non-minorities.

The court found that plaintiff was "in no better position to bring this action" than a minority family and thereby denied plaintiff standing. *Id.* at 1308.

We, however, think that *Sullivan* was not intended to support the restrictive interpretation of standing that these cases seem to represent. Although *Sullivan* [9] quoted from *Barrows*, a case in which the plaintiff was the 'only effective adversary', the Court did not limit standing to such situations. Moreover, in *Sullivan*, Freeman, the African American man to whom Sullivan attempted to lease his property and membership share was also a plaintiff in the civil rights action. Sullivan, the white plaintiff, was not then the only potential or effective litigant. *See also Winston*, 558 F.2d at 1270 (upholding the standing of a white man fired protesting the discriminatory discharge of a fellow black employee, despite the fact that the black employee also sued the employer).

In *Clemes v. Del Norte County Unified School District*, 843 F.Supp. 583 (N.D.Cal. 1994), a sister court interpreting the law of its Circuit raised questions as to whether the Ninth Circuit decision in *Halet* should be interpreted so restrictively. Moreover, in the *Clemes* case, the court ruled that plaintiff should still be granted standing even if *Halet* was interpreted as granting standing to a non minority plaintiff in § 1981 or § 1982 claim only where there is no minority plaintiff who could do so. In *Clemes*, a school teacher brought suit against a school district and school district officials, alleging that he was retaliated against as a result of trying to rectify improprieties that he witnessed by his employees and the school district. He alleged that he suffered injuries that stemmed from discrimination against Native American students who were a protected class. The court granted standing by concluding that plaintiff alleged his own personal injuries due to defendants' discriminatory acts and that the injuries for which he sought relief were all personal to him i.e. humiliation and suffering, loss of job and reputation. More specifically, the court found that plaintiff was the

**9.** The court noted that a potential black purchaser would have had a difficult time proving that he had been the victim of discriminatory actions by the board, since the board manifested its discrimination against him by buying out the white landlord's membership shares.

only effective and proper plaintiff to bring the suit because,

> clearly none of the students who were allegedly direct targets of discrimination would have standing to bring these claims. It is true that these students could themselves bring suit to redress the discrimination against them, just as the minority tenants in *Halet* ... Unlike the putative plaintiffs in *Halet,* Mr. Clemes's suit springs from a different injury—namely, the retaliation against him for seeking to vindicate the rights of others. This injury stems from the defendants' discrimination, yet it cannot be redressed by the direct targets of discrimination.

*Id.* at 592.

Turning to the case before the court, the court finds that although the African American tenants could have brought the action against defendants, a reasonable interpretation of *Sullivan* permits plaintiff to bring this action. However, even if a narrow interpretation was applied in which a non-minority plaintiff would be granted standing only where there are no minority plaintiffs to redress the injury, Puglisi's standing would still be upheld because the personal injury that he alleges, similar to those alleged in *Clemes,* of humiliation and suffering, loss of income and reputation could not be redressed by the direct targets of the discrimination. Therefore, Puglisi is the only effective plaintiff to bring this suit and this court finds that he is a proper plaintiff under 42 U.S.C. §§ 1981 and 1982.

## 2. Section 1983

■ While § 1981 has provided the most discussion for applying the *Sullivan* principle to standing, several Circuit Courts, including the Second Circuit, have applied the principle to § 1983 [10] claims. In *Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702 (2nd Cir.1982), the Second Circuit, reversed a District Court's dismissal of a plaintiff corporation's suit brought under the Fourteenth

Amendment and 42 U.S.C. §§ 1981, 1983, 1985 and 2000d because the district court held that a corporation, not having a racial identity, lacked standing to assert a claim of racial discrimination. Plaintiff corporation produced theatrical productions for black and latino communities and alleged that defendant had taken various racially motivated adverse actions against it. The Second Circuit, per Friendly, J., reversed, holding that the prudential considerations supported extending standing to the corporation and noted that, "[The plaintiff corporation] has a far more solid claim of injury in fact than would any resident who would have to allege an interest in attending an as yet unannounced production, or a prospective employee who might be only one of many that would seek to apply for positions not yet offered as a result of the [government]'s denial of the grant." *Id.* at 706. The court noted further that plaintiff was the most effective advocate to challenge the discriminatory practices which lead to the denial of the government grant.

In *Des Vergnes v. Seekonk Water District,* 601 F.2d 9 (1st Cir.1979), the First Circuit upheld the standing of a corporation that planned to construct a low-income housing project and brought suit pursuant to §§ 1981, 1983 and 1985(3) against defendant alleging that defendant refused to extend water services to the area because the project would attract blacks to the area. In upholding the corporation's standing pursuant to § 1983, the First Circuit held;

> Few principles of law are more firmly stitched into our constitutional fabric than the proposition that a State must not discriminate against a person because of his race or the race of his companions, or in any way to "compel or encourage racial segregation." *Adickes v. Kress & Co.,* 398 U.S. 144, 151–152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970). Therefore a State may not punish a nonwhite for having social contacts with a black. *Ibid.* Likewise

10. Section 1983 reads in relevant part, "every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

it may not through one of its creatures, punish or discriminate against a corporation for its willingness, past or present, to make contracts with blacks. And if it does so, then the person so punished or discriminated against has a § 1983 right of action. *Crow v. Brown*, 457 F.2d 788 (5th Cir.1972) aff'g 332 F.Supp. 382, 384 (N.D.Ga.1971); *Dailey and Columbia Sq. Inc. v. City of Lawton, Okl.*, [425 F.2d 1037, 1038 (10th Cir.1970) ].

601 F.2d at 17; *Yesteryears, Inc. v. Waldorf Restaurant, Inc.*, 730 F.Supp. 1341 (D.Md. 1989) (white tenants who operated nightclub granted standing to bring civil rights action against landlords' alleged racially discriminatory action aimed against black patrons).

In the Fourth Circuit case, *Scott v. Greenville County*, 716 F.2d 1409 (4th Cir.1983), a real estate developer, planning to construct low income apartments, was the proper plaintiff to assert the rights of prospective minority tenants victimized by defendants' alleged discriminatory activity of rezoning the building site to prevent the construction and thereby prevent the attraction of minority residents to the area. The court there stressed that plaintiff in his own right had suffered an injury and had standing to bring the action. The court said: "[M]ore importantly, if defendants singled Scott for disadvantageous treatment because of his willingness to house minority tenants, then Scott in his own stead suffered injury to his right to be free from official discrimination." 716 F.2d at 1415. The Fourth Circuit criticized the district court's belief that standing to assert the discriminatory practice of the government was lacking because plaintiff was not a member of the minority class.

These cases show that plaintiff, in the present case, has standing to bring the § 1983 claim. Although plaintiff, here, is not a corporation, plaintiff is alleging that he was singled out for disadvantageous treatment by the Village defendants' who, acting under the color and authority of law, selectively enforced its laws and codes because they believed plaintiff was in a rental contract with or otherwise associated with his African American tenants. The principle set forth by case precedent is that a state, through its agents or otherwise, cannot discriminate against or punish a person because of his race, the race of one's companion, or the race of those one chooses to socialize, associate or contract with. Given these firm and established principles in the application of § 1983, we find that plaintiff has standing to bring this claim.

### 3. Section 1985(3)

■ Plaintiff alleges that the Underhill defendants individually and together with the Village defendants conspired to deprive him of equal protection of the laws and equal privileges and immunities under the law and brings this action pursuant to § 1985(3).[11] Puglisi does not allege that defendants conspired to deny him equal protection because of his race or class status, nor is he a member of the race of his tenants which was the motivation of defendants' alleged conspiracy. Defendants assert no particular attack on this claim other than their general attack on plaintiff's lack of standing to assert civil rights claims. Essentially, the issue before the court is which persons or class of persons may seek such remedies under this statute.

The case law on this issue is marked by continuous and constant change in interpretation which has resultingly paved a path of inconsistencies and confusion. This court will address the issue by surveying the case law that interprets the statute in regards to this issue. In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court upheld a § 1985(3) claim against private actors who allegedly attacked three black men walking down a highway solely because they were black. The Court held that § 1985(3), itself, did not have a state action requirement and, therefore, could reach solely private conspiracies. This holding overruled *Collins v. Hardyman*, 341

---

**11.** Section 1985(3) provides in relevant part that "if two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

U.S. 651, 71 S.Ct. 937,. 95 L.Ed. 1253 (1951) which found that state action was necessary for liability under the statute. The Court observed that although the 'equal protection' and 'equal privileges under the law" language in the statute was similar to the equal protection clause, which does speak only to the states and state action, "there is nothing inherent in the phrase that requires the action working the deprivation to come from the State." *Griffin,* 403 U.S. at 97, 91 S.Ct. at 1796.[12] Having extended § 1985(3)'s coverage to private conspiracies, the "Court also recognized that the statute was not intended to apply to 'all tortious, conspiratorial interferences with the rights of others.' The limiting element was the requirement of invidiously discriminatory motivation." *Emanuel v. Barry,* 724 F.Supp. 1096, 1099 (E.D.N.Y. 1989) (quoting *Griffin,* 403 U.S. at 97, 91 S.Ct. at 1796). Moreover, the Court held that the language in § 1985(3) of intent to deprive a person of equal protection or equal privileges and immunities meant that there "must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's actions." *Id.* at 102, 91 S.Ct. at 1798; *See also Trautz v. Weisman,* 819 F.Supp. 282 (S.D.N.Y.1993) (class of individuals with disabilities may be a protected class under § 1985(3)).

In *Selzer v. Berkowitz,* 459 F.Supp. 347 (E.D.N.Y.1978), the court seemed to limit the holding of *Griffin* requiring an allegation and showing of a class based discriminatory animus to only private conspiracies. The court found that plaintiff had alleged a class based animus sufficient to survive defendant's motion to dismiss in his civil rights action claiming that defendants had deprived him of equal protection. In that case, plaintiff, alleging that he was a member of a class of

teachers in the teaching profession who talked to or associated with the CIA but could not cite other members of the class or even prove similar conspiracies. The court, in a detailed analysis of *Griffin,* held that where state action was involved no requirement of a showing of class based discriminatory animus was required. *Id.* at 352; *Conrad v. Perales,* 818 F.Supp. 559 (W.D.N.Y. 1993).

In *Conrad,* the District Court considered plaintiff's argument to adopt the *Selzer* interpretation and permit their complaint to stand, absent allegations of class-based discriminatory animus due to the presence of a state action allegation. The court, citing numerous authorities in the Second Circuit and the district courts, declined to adopt *Selzer* and find a state action exception to the *Griffin* standard.

Without specifically overruling *Selzer,* the Second Circuit has continued to require an allegation of discriminatory animus by conspirators under § 1985 even when the conspiracy involves a government actor. *See Katz v. Klehammer,* 902 F.2d 204 (2d Cir. 1990); *Keating [v. Carey],* 706 F.2d [377] at 386–388 [ (2nd Cir.1983) ]. Several district courts within the circuit have explicitly declined to follow *Selzer*'s lead (*Smith v. Walsh,* 519 F.Supp. 853, 856 n. 4 (D.Conn.1981)); *Singer v. Bell,* 613 F.Supp. 198, 201 n. 4 (S.D.N.Y.1985), as has the Seventh Circuit. *Munson v. Friske,* 754 F.2d 683 ( [7th Cir.] 1985) (Nothing in the language of *Griffin* indicates that the animus requirement is limited to private conspiracies).... Most recently, the Supreme Court reaffirmed the *Griffin* requirement. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113

---

**12.** The Supreme Court later addressed the scope of § 1985(3) in *United Brotherhood of Carpenters & Joiners of America v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), a case in which a construction company and two employees brought suit under § 1985(3) against trade union members, council and other private individuals alleging that they assaulted workers and destroyed property. The Court held that state action was required and explained that in view of *Griffin,* § 1985(3) still applies to wholly private conspiracies but when the rights claiming to have been infringed are only enforceable against

the states, a showing of state action is necessary. The Court reasoned that "*Griffin* did not hold that even when the alleged conspiracy is aimed at a right that is by definition a right only against state interference that the plaintiff in a § 1985(3) suit nevertheless need not prove that the conspiracy contemplated state involvement of some sort." 463 U.S. at 833, 103 S.Ct. at 3358. The Court therefore held that the statute can be applied to private conspiracies aimed at interfering with rights constitutionally protected against private as well as official encroachment.

S.Ct. 753, 122 L.Ed.2d 34 (1993). The opinion quotes with approval *Griffin*'s inclusion of this animus to prevent the statute from becoming a general federal tort statute.

818 F.Supp. at 565.

■ Turning to the case at bar, plaintiff alleges that a conspiracy was planned and implemented by the Underhill defendants separately and in conjunction with the Village defendants, hence plaintiff's complaint alleges both private and government conspiracies. For the private conspiracies, *Griffin* has made clear that plaintiff must allege a class based discriminatory animus under § 1985(3) when plaintiff maintains that it was a private conspiracy that infringed upon his equal protection rights. For the § 1985(3) claim alleging state action, this court, like the court in *Conrad*, finds that plaintiff must also allege a class-based discriminatory animus even when it is alleged that the government or state was involved in the conspiracy.

In his complaint, plaintiff, does allege that both defendants were motivated by a class based discriminatory animus against his African American tenants. Plaintiff claims that because defendants did not want the African Americans living in the neighborhood, they together conspired to deprive him, as the landlord, of equal protection of the law and equal privileges and immunities under the law. The issue lies, however, in the fact that although plaintiff does allege a class based discriminatory animus stemming from race, he himself is not a member of that class. Therefore, the court must consider given the case law whether plaintiff is barred from bringing this action.

In *Griffin*, the Court expressly left open the question concerning the scope of § 1985(3)'s application. The Court held: "we need not decide ... whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us." 403 U.S. at 102, n. 9, 91 S.Ct. at 1798, n. 9. In *United Brotherhood of Carpenters &*

*Joiners,* 463 U.S. at 837, 103 S.Ct. at 3360–3361, the Court again revisited the question of scope but again left open the question of whether the section was intended to reach any class-based animus besides animus against blacks. The Court noted that it was a close question whether the section "was intended to reach any class-based animus other than animus against Negroes and those who championed their cause, most notably Republicans," *Id.* at 836, 103 S.Ct. at 3360, and highlighted the legislative history of § 1985(3) tending to "support the view that § 1985(3) has a broader reach." *Id.*[13]

Appellate courts have since held consistently that racial groups other than blacks and discriminatory intent other than racial bias is sufficient for plaintiff to bring a § 1985(3) claim when plaintiffs are the object of discriminatory animus because of their membership in a group, i.e. a class under § 1985(3). *See e.g. New York State National Organization for Women, et al. v. Terry, et al.,* 886 F.2d 1339 (2d Cir.1989) (women are a class under section 1985(3)). Courts have held that § 1985(3) extends to 'discrete and insular' minorities who are protected under the equal protection clause because of their personal characteristics. *See Browder v. Tipton,* 630 F.2d 1149, 1150 (6th Cir.1980), while other courts have held that § 1985(3) applied only to groups who are understood to be traditionally disadvantaged and well-defined. *See Orshan v. Anker,* 489 F.Supp. 820 (E.D.N.Y.1980).

The Supreme Court in *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993), held that opposition to abortion does not qualify as a class-based invidiously discriminatory animus for purposes of a private conspiracy in violation of § 1985(3). The Court held that a class under § 1985(3) must be "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors. Otherwise, innumerable tort plaintiffs would be able to assert causes of action under § 1985(3) by

---

**13.** Senator Edmunds stated on the Senate floor that if there existed a conspiracy against a person "because he was a Democrat, if you please, or because he was a Catholic or because he was a Methodist, or because he was a Vermonter, ... then this section could reach it." Cong.Globe, 42d Cong., 1st Sess. 567 (1871), quoted in *Scott,* 463 U.S. at 837, 103 S.Ct. at 3360–3361.

simply defining the aggrieved class as those seeking to engage in the activity the defendant has interfered with." *Id.* at 266, 113 S.Ct. at 759.

In *McLoughlin v. Altman,* 1993 WL 362407, 3 (S.D.N.Y.), the District Court in citing the Supreme Court decision in *Griffin* and *Bray* denied plaintiff's class status, as the complaint only defined the class as the group of victims of the alleged tortious action. The court held, "to state a cause of action under § 1985(3), a claimant must show, among other things, that she belonged to the type of class that is protected by that statute and that 'some racial, or perhaps other class-based, invidiously discriminatory animus behind the conspirator's actions'." *Id.* at 6. (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

Pursuant to the case law cited above, this court holds that plaintiff cannot bring this § 1985(3) claim because, although he has alleged that defendants' acted and conspired pursuant to a class or race based discriminatory animus, plaintiff is not a member of the class protected by the statute nor a member of the race triggering the alleged racial discrimination. Plaintiff does not even allege that he is a member of a group or a class. He brings this action asserting that he, as an individual, was deprived of equal protection due to the conspiratorial acts of the defendants'. Given the law of this Circuit, Puglisi does not have standing to bring such a claim under § 1985(3).

The court has found no case extending § 1985(3) to a non-class member as with the other civil rights statutes discussed above. However, it is not necessary for the court to find that this plaintiff has standing for the same reasons that he has standing under the other civil rights statutes discussed above. Even if this court were to accept the theory put forth in *Selzer,* 459 F.Supp. at 351–52, the claim would still not survive given the court's granting of defendants' motion for summary judgment for plaintiff's failure to establish material facts warranting trial.

### 4. Section 1986

The law of this Circuit is clear in interpreting this section. In *Jews for Jesus v. Jewish Community Relations Council of New York, Inc.,* 968 F.2d 286 (2d Cir.1992), the court ruled that there can be no cause of action under 42 U.S.C. § 1986 unless there is a violation or cause of action under § 1985. 968 F.2d at 291. Because this court dismisses Puglisi's claim under § 1985, we also dismiss his claim under § 1986 which provides a remedy for violations of § .1985.

This court concludes when the facts alleged in plaintiff's complaint are taken as true, plaintiff satisfies the Article III requirement of 'case or controversy' by alleging that he has a personal stake in the case and has sustained personal injury from defendants' complained of actions. In addition, plaintiff meets the prudential consideration of §§ 1981, 1982 and 1983 applied by federal courts in standing issues, by alleging that he has been injured by defendants' retaliatory actions for refusing to engage in purposeful discriminatory practices, for attempting to vindicate the rights of his African American tenants to reside in his 56 Underhill premises in the Tuckahoe community, and lastly for contracting with the African Americans. However, the plaintiff is prohibited from bringing his § 1985(3) because, in order to bring a claim alleging private and public conspiracies, plaintiff must allege class-based discriminatory animus on the part of the defendant and must himself be a member of the class. Here, plaintiff does allege class-based discriminatory animus directed against the racial class of his tenants but plaintiff himself is not a member of the class, nor does he allege that he is a member, therefore, his § 1985(3) claim is barred. Because plaintiff's § 1985(3) claim is barred, plaintiff's § 1986 is also barred.

### B. Standing under the Fair Housing Act

Plaintiff alleges that his rights to contract and to equal housing opportunity under Title VIII of the Fair Housing Act of 1968, as amended 42 U.S.C. 3601, *et seq.,* has been denied him due to defendants' actions. In addition, plaintiff claims that his right to be

free from coercion or intimidation in the exercise of rights protected by the Fair Housing Act, Sec. 3601, *et seq.*, has in turn violated Sec. 3617 of the same act. In interpreting the Fair Housing Act, the "Supreme Court has said that Congress intended standing under this Act to extend to the full limits of Article III. The normal prudential barriers to standing may not be set up as obstacles to the maintenance of actions under the Fair Housing Act ... The plaintiff has alleged economic injury to himself, satisfying the Article III requirement, and that is all that need be shown." *Mackey*, 724 F.2d at 422–23. Therefore, as a matter of law, federal court prudential limitations do not apply when considering the standing requirement under a Fair Housing Act claim.

For example, in *Mackey*, a black insurance agent brought an action against an insurer, challenging the insurer's redlining practice as a violation of the agent's civil rights and the Fair Housing Act. The court reasoned that Mackey's alleged injury satisfied Article III standing requirements which was enough to sustain the Fair Housing Act claim [14] but not the civil rights claims [15] because of the added element of the court's prudential principles. In this case, plaintiff is alleging that he has suffered economic injury and non economic injury due to defendant's conduct and cites this as the basis of his Fair Housing Act claim. Case law has shown such injury is enough to satisfy the standing requirement.

In error, plaintiff relies on the case *Trafficante v. Metropolitan Life Insurance Company*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) as a basis for establishing his

standing under the Fair Housing Act.[16] In *Trafficante*, a black and a white tenant of an apartment complex brought an action pursuant to § 810(a), as amended by § 3610(a), against the landlord claiming that by discriminating against and excluding nonwhites from the rental complex on the basis of race which is in violation of § 804, as amended by § 3604, the landlord stigmatized the residents as residents of a 'white ghetto' and deprived them of the social and professional advantages of living in an integrated community. The court noted that the loss of the important benefits from interracial associations was a sufficient allegation of injury by the existing white tenants to fall within the language of 'person aggrieved' in the statute and, therefore, were granted standing to bring their action.

The court reasoned that the "the definition of 'person aggrieved' contained in § 810(a) is in terms broad, as it is defined as 'any person who claims to have been injured by a discriminatory practice.' ... The person on the landlord's black list is not the only victim of discriminatory housing practices; it is, as Senator Javits said in supporting the bill, 'the whole community,' 114 Cong.Rec. 2706 ... We can give vitality to s 810(a) only by a generous construction which gives standing to sue to all in the same housing unit who are injured by racial discrimination in the management of those facilities within the coverage of the statute." *Id.* at 208, 211, 93 S.Ct. at 366, 368; *See also Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).[17]

**14.** The Court held that plaintiff had standing under the Fair Housing Act to challenge the alleged redlining practices of the insurer because he alleged that he himself had lost opportunities to sell property insurance to the potential black clients.

**15.** The Court held that plaintiff lacked standing under the Civil Rights Act because he was not a member of the class of policy holders who were harmed by the redlining practices and he did not allege that he was a victim of discrimination but only alleged that he lost opportunities to sell property insurance.

**16.** Section 3610(a) of the Act provides in relevant part that any person who claims to have been injured by a discriminatory housing practice or who believes that he will be irrevocably injured

by a discriminatory housing practice that is about to occur may file a complaint with the Secretary ... [if] the secretary has been unable to obtain voluntary compliance with this title, the person aggrieved may, within thirty days thereafter, commence a civil action in any appropriate United States district court ... 42 U.S.C. § 3610(a), (d).

**17.** The court, in *Trafficante* noted that complainants must be allowed broad parameters to bring the cause of action because "the complainants act not only on their own behalf but also as private attorneys general in vindicating a policy that Congress considered to be of the highest priority." *Id.* at 209, 93 S.Ct. at 366–367. The court cited several cases to support the notion that the role of 'private attorneys general' was

In the case before the court, Puglisi alleges, not in his complaint but in his Memo in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction, that on account of defendants' actions, he, too, suffered personally because he was being "denied the important benefits of interracial associations" and that like in prior cases, the court should grant standing on this basis. The distinction that plaintiff overlooks is that he, unlike the plaintiffs in the case upon which he relies, is not a resident in the building in which his tenants reside, neither is he a member of their community. Plaintiff has for several years lived in a co-op apartment on the Bronxville border, a suburban community. He cannot claim that he is being deprived by either defendants' alleged discrimination in the "important benefit of interracial association" or the "social or professional benefit" of living in an integrated community on Underhill Street since he does not live on or sufficiently in the proximity of Underhill Street.

Additionally, similar to the prudential considerations of §§ 1981 and 1982 of the Civil Rights Act, the courts have limited the ruling in *Mackey* and ruled that although prudential considerations are not applied in claims brought under § 3610(a) and 3612 and despite the fact that these statutes are interpreted as broad as Article III allows in permitting standing for those injured by housing discrimination based on race, the cases "do not recognize a right of housing providers ... to advocate their residents rights against discrimination." *Hotel St. George Associ-*

*ates,* 819 F.Supp. at 319. Plaintiff must rely on his own injury and not that of his residents. *Trafficante* is the incorrect standard to apply to determine if Puglisi satisfies the court's standing requirements. He is neither a tenant nor a member of the community in which defendants' alleged actions took place. To look to *Trafficante* as the ruling authority, plaintiff would essentially be bringing the claim on behalf of his tenants, those robbed of the benefits of interracial association. By applying the correct Article III analysis to plaintiff's Fair Housing Act claim, the court grants plaintiff standing to bring this claim, subject, however, to the other judicial parameters.

### 1. Section 3604 of the Fair Housing Act

▪ Sections 3610 and 3612 give plaintiff the right to bring an action in federal court for defendants' alleged illegal discriminatory practices in housing prohibited by §§ 3603, 3604, 3605, 3606. The most relevant statute to the situation at bar is § 3604.[18] Therefore, plaintiff's right to bring the action under §§ 3610 and 3612 turns on how the courts have interpreted § 3604. Courts have interpreted § 3604(a) as referring to the act of making unavailable or denying 'a dwelling' and not the act of denying services to a dwelling. *See Southend Neighborhood Improvement Association v. County of St. Clair,* 743 F.2d 1207, 1210 (7th Cir.1984) (where plaintiff failed to allege they were hindered in an effort to acquire a dwelling,

---

not uncommon in modern legislative programs. *Id.; See, Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968); *Allen v. State Board of Elections,* 393 U.S. 544, 556, 89 S.Ct. 817, 826–827, 22 L.Ed.2d 1 (1969). Additionally, the Supreme Court, in *Gladstone,* held that standing for § 3612 of the Fair Housing Act is to be understood as broad as § 3610 was interpreted to be in *Trafficante.* Therefore, the Court granted standing under § 3612 to black tenants, the direct victims, and to white tenants, indirect victims, of defendants, two real estate brokers, alleged discriminatory practice of steering prospective Black home buyers from predominately white areas toward an integrated 'target' area in Belwood and steering prospective White home buyers away from the 'target area'.

18. § 3603 describes a dwelling that is subject to the provisions of the Fair Housing Act. § 3605 deals with discrimination in residential real estate-related transactions while § 3606 deals with discrimination in the provision of brokerage services. 42 U.S.C. §§ 3603–3606.

Sec. 3604(a) and (b) provide in relevant part that it shall be unlawful;

(a) to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race ...

(b) to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race ...

Id at § 3604.

plaintiff failed to state a claim under § 3604(a)).

In addressing the applicability of § 3604(b), case law shows that the 'provision of services' language of the act has been applied to claims against landlords. *See e.g., Betsey v. Turtle Creek Associates,* 736 F.2d 983, 985 (4th Cir.1984) (§ 3604(b) applied to landlords adults only policy); *Khawaja v. Wyatt,* 494 F.Supp. 302, 303 (W.D.N.Y.1980) (section applied to landlord's eviction of tenants for late payment of rent). Furthermore, case law shows that the section has also been applied against municipal service providers. *See Southend,* 743 F.2d at 1210 (section applies to 'services generally provided by governmental units such as police and fire protection or garbage collection'); *Mackey,* 724 F.2d at 424 (section applies to things like garbage collection and other services of the kind usually provided by municipalities). In *Clifton Associates,* 728 F.Supp. at 29 (D.D.C.1990), the court interpreted and thereby limited both (a) and (b) of § 3604 as being directed at landlords, providers of housing and municipal service providers; *See also Clifton Associates,* 929 F.2d 714 (D.C.Cir.1991) (court held that an elevator manufacturer's refusal to service an elevator in an apartment complex because tenants were black did not violate § 3604 since manufacturer was not a landlord and did not have a duty under the Act to furnish services in a nondiscriminatory manner).

Similarly, in this case, defendants are not landlords, providers of housing nor municipal service providers to plaintiff. The Underhill defendants are individuals who reside in the community while the Village defendants consist of members of the board of trustees, the Mayor and the building inspector of the Village of Tuckahoe. Neither of the defendants are providers of housing to the plaintiff. While it may be argued that the Village defendants are municipal service providers or the denial of such services by these defendants to plaintiff's premises may be construed as making the premises 'unavailable for dwelling', the Appellate Court in the District of Columbia addressed this issue and

held that "although the denial of certain essential services relating to a dwelling, such as mortgage financing, sewer hookups, zoning approval, or basic utilities, might result in the denial of housing, this interpretation ... does not extend the reach of 804(a)." *Clifton Associates,* 929 F.2d at 719.

For § 3604(b), the court noted that the proposition set forth in *Mackey* of applying this section to municipal service providers rather than to landlords and housing providers was sketchy. The court reasoned that the court in *Mackey* cited no authority for its characterization and is of questionable weight, even though the Court relied upon the decision in *Southend.* Discriminatory municipal policies may rise to the level of a violation of the equal protection clause of the Fourteenth Amendment, but the court reasoned that "to say that every discriminatory municipal policy is prohibited by the Fair Housing Act would be to expand that Act to a civil rights statute of general applicability rather than one dealing with the specific problems of fair housing opportunities." *Id.* at 720 (quoting *Vercher v. Harrisburg Housing Auth.,* 454 F.Supp. 423, 424 (M.D.Pa. 1978)).

In this case, even if this court were to accept the proposition that § 3604(b) applies to municipal service providers and reject the contrary propositions in both *Clifton Terrace Associates* and *Vercher,* plaintiff does not allege that the Village defendants provided or failed to provide municipal services such as garbage collection thereby triggering a violation of § 3604(b). The actions plaintiff complains of such as selectively enforcing ordinances, housing codes, and fire and zoning regulation trigger § 3604(a) and not § 3604(b), given the prohibited actions of both of these statutes. However, these complained of actions are the very actions that the court in both *Clifton Terrace Associates'* cases held did not fall within the ambit of that section. Therefore, this court finds that plaintiff does not have standing to bring his section §§ 3610 and 3612 claims because defendants action do not fall within the ambit of § 3604(a) or (b).[19]

19. Were this court to grant Plaintiff standing to bring the § 3604(a) claim, the claim would still

not survive given the court's disposition on defendants' motion for summary judgment to dis-

### 2. Section 3617

■ Plaintiff alleges his rights to be free from coercion, intimidation and threats under § 3617 due to his encouragement and assistance of those protected by the Fair Housing Act have been violated. The issue is whether § 3617 [20] vests plaintiff with a right despite the fact that there has been no violation of §§ 3603, 3604, 3605, 3606. In a series of cases, the courts have interpreted § 3617 to extend beyond the activities of housing providers. "Although most of the legislation is designed to prevent illegal discrimination on the part of housing providers, one provision specifically prohibits unrelated third parties from interfering with anyone who is attempting to aid others protected under the Act from obtaining housing choices." *People Helpers, Inc. v. City of Richmond,* 789 F.Supp. 725, 731 (E.D.Va.1992); *See also Clifton Terrace,* 728 F.Supp. at 30.

Furthermore, the courts have ruled that although § 3617 refers to rights granted and protected by §§ 3603–3606, § 3617 may still be violated absent a violation of §§ 3603, 3604, 3605, 3606. *See Smith v. Stechel,* 510 F.2d 1162 (9th Cir.1975). Moreover, in *Stackhouse v. DeSitter,* 620 F.Supp. 208 (N.D.Ill.1985), the court provided the three distinct instances in which a plaintiff may bring a § 3617 claim.

> (1) in the exercise or enjoyment of any right protected by sec. 's 3603–3606; (2) on account of the person's having exercised or enjoyed such a right; and (3) **on account of his having aided or encouraged any other person in the exercise or enjoyment of such a right.**

*Id.* at 211. According to judicial precedent with respect to § 3617 of the Fair Housing Act, plaintiff in the present action satisfies the third situation. Therefore, this court holds that as a result of this statutory right and alleged ensuing violation by defendants, plaintiff has standing under this section and may bring his action pursuant to § 3617.

### IV. Defendants' Motion for Summary Judgment.

Although this court found it necessary to provide a detailed analysis of the complex issues regarding standing under plaintiff's various Civil Rights and Fair Housing Act claims, given the record before the court, it is clear that the court has a much easier task of explaining its ruling in favor of defendants on defendants' motion for summary judgment on the grounds that plaintiff has submitted no evidence that there is a genuine issue as to a material fact in this case on which a reasonable jury could rule in his favor.

As the factual allegations have already been presented, the court will not restate them here but will briefly note those facts on which both sides agree that there is no genuine issue of material fact. According to Local Rule 3(g) [21] statements filed by both parties, there is no dispute that Mr. Puglisi, the plaintiff, is a Caucasian male who owned the premises at 55 and 56 Underhill Street in the Village of Tuckahoe. The property located at 56 Underhill Street is listed as a two family dwelling and is over one hundred years old. From 1989 through 1991, plaintiff rented three separate rooms to a Mr. Basil Bromfeld, a Mr. Blanche and a Mr. Ted Lawrence, who were not Caucasian but Afri-

---

miss the claims for plaintiff's failure to establish that defendants' actions were racially discriminatory.

**20.** Sec. 3617 provides: "it shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted under or protected by 3603, 3604, 3605, or 3606 of this Title." 42 U.S.C. § 3617.

**21.** Rule 3(g) of the Local Civil Rules reads: "Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement constitutes grounds for denial of the motion ... The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried ... All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Civil Rule 3(g), U.S. DIST FOR THE SOUTHERN AND EASTERN DISTRICTS OF NEW YORK, JOINT RULES.

can–American. *See* Village Defendants' 3(g) Statement ¶ 4. In late 1991, Mr. Blanche moved out and was replaced by a Mr. Charles McGrath who is not an African–American.

At the time mentioned in the complaint regarding the 56 Underhill premises, the property located at 55 Underhill Street did not have any tenants. In 1992, plaintiff had electrical work done at his 55 Underhill building and repair work done at his 56 Underhill Building. Defendant Ron Gallo who owns a two family house at 58 Underhill Street filed a complaint with the Village of Tuckahoe about plaintiff's doing electrical work on the 55 Underhill premises without a permit. Finally, it is agreed that defendant Ron Gallo owns a two-family house at 58 Underhill Street.

Both sides concede that Mr. Puglisi's complaint alleges harassment during the term of the leasehold of Mr. Bromfeld, Mr. Blanche, and Mr. Lawrence by the Mayor of the Village, the Village of Tuckahoe Board of Trustees and its building inspector. Additionally, the parties agree that a Mr. Joseph Yancy who is an African American, was a member of the Board from 1989 to 1992, the time period in which the three gentlemen named above rented plaintiff's premises. He is not a named defendant in the litigation while the other members of the Board during this same period were named as defendants in plaintiff's complaint.

Pursuant to Rule 56(b) and (c) [22], both defendants filed motions for summary judgment and urged this court to grant their motions and dismiss plaintiff's claims arguing that there is no evidence to support plaintiff's allegations. The Underhill defendants contend that plaintiff's own deposition refutes many of the allegations in his complaint and shows that there is no evidence supporting the notion that defendants conspired to discriminate against plaintiff's African–American tenants due to their race or any other impermissible reasons in an effort to force their eviction by harassing plaintiff. The Village defendants also rely on plaintiff's deposition to show that there is no evidence of the Village defendants' conspiring with the Underhill defendants to force the eviction of plaintiff's tenants or of the Village defendants selectively enforcing its codes and regulation due to a racially discriminatory animus. In his response to defendants' motion for summary judgment, plaintiff resubmitted the two verified complaints maintaining that because the complaints were verified, they were being submitted as affidavits in opposition to the motions for summary judgment. Furthermore, plaintiff argued that neither of the defendants' affidavits in support of their motions for summary judgment actually supported the motions and did little to question the validity of the complaint.

For the reasons set forth herein, this court agrees with defendants and grants their motions for summary judgment.

## A. Summary Judgment

A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Where, as in this case, the non moving party has the burden of proof at trial, the moving party need only demonstrate that there is a lack of evidence to support the non movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–325, 106 S.Ct. 2548, 2552–2554, 91 L.Ed.2d 265 (1986). Once the movant has

---

**22.** Rule 56(b) reads in relevant part, "a party against whom a claim ... is asserted ... may, at any time, move *with or without supporting affidavits* for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Rule 56(c) reads in relevant part, "the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(b), (c) (emphasis added).

established a prima facie case demonstrating the lack of a genuine issue of material fact, the non moving party must provide enough evidence to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–2511. All of the facts must be read in the most favorable manner for the non moving party. *Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 721 (2d Cir.1994).

At that point, the court must determine whether the evidence presents a "genuine factual issue that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party." 477 U.S. at 250, 106 S.Ct. at 2511. The court may grant summary judgment only when "no rational jury could find in favor of the non-moving party." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir. 1994).

Applying these general principles to the case before the court, the court rules in favor of the defendants on their motions for summary judgment. Before making its decision, the court held a hearing. At the hearing, plaintiff continuously repeated to the court that there were disputes over material facts and issues warranting a trial, specifically, a dispute over the factual allegation that Underhill defendant, DeMeo, approached the plaintiff threateningly and told him that renting to *'niggers'* caused the property value in the neighborhood to decrease. The Underhill defendants denied the interaction and plaintiff thereby surmised that this dispute was a factor showing why this case should advance to trial.

Furthermore, at the hearing and in his Memorandum of Law in Opposition to Summary Judgment, plaintiff, in response to defendants' attack on plaintiff's responsive pleading as not conforming to Rule 56(e)[23], maintained that his verified complaints were being resubmitted as affidavits to establish genuine issues warranting a trial. *See* Memorandum of Law in Opposition to Summary Judgment p. 7. Therefore, plaintiff concluded that his alleged non-compliance with Rule

56(e) cannot be a basis for granting the motion since he complied by submitting an affidavit. Moreover, plaintiff argued, defendants were the parties who did not comply with Rule 56 because defendants' affidavits were of little value and thereby, failed to establish that there was no issue warranting trial. Because defendants failed to make and support a motion in compliance with the Rule 56, plaintiff concluded that defendants' motions should be denied. Therefore, the form of plaintiff's reply to the defendants' motion would not be dispositive since defendants, themselves, had made an improper motion for summary judgment.

With respect to plaintiff's conclusion that a genuine issue of fact exists because of the factual dispute over whether Underhill defendant DeMeo made the alleged statement, this court informed plaintiff then, as it does now, in considering the motion "this Court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Dean Tarry Corp. v. Friedlander,* 650 F.Supp. 1544, 1549 (S.D.N.Y.1987); *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1477 (7th Cir.1990) (summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") (citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 245–251, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)); *Knight v. United States Fire Insurance Co.,* 804 F.2d 9, 10–11 (2d Cir.1986) (citing *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 245–251, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)); *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985).

The court finds plaintiff's reasoning about his responsive pleadings unpersuasive and insufficient. Even if the court were to accept plaintiff's position on his responsive plead-

---

**23.** Rule 56(e) reads in relevant part, "when a motion ... is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

ings, his verified complaints, turned affidavits for purposes of opposing defendants' motions, present no specific facts other than what has been alleged and denied in the verified complaints. Courts have prohibited such responsive pleadings. In *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553, the court held "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, ... Rule 56(e) therefore requires the non-moving party to go beyond the pleadings and by her own affidavits, ... designate 'specific facts showing that there is a genuine issue for trial'." *Id.* (original emphasis); *Dean Tarry,* 650 F.Supp. at 1550; *Clifton Terrace Associates,* 728 F.Supp. at 31 (plaintiff may not rely on mere speculative allegations but must set forth affirmative evidence of the existence of a genuine issue warranting trial) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257–257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986)); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (the last two sentences of Rule 56(e) were added to disapprove cases allowing a party opposing a properly made summary judgment to resist the motion by relying only on its pleadings).

Lastly, in regards to plaintiff's argument that defendants' fail to produce evidence showing that there is no genuine issue warranting trial due to the fact that defendants' affidavits are of no value, the court acknowledges that "the party opposing the motion for summary judgment bears the burden of responding *only* after the moving party has met its burden of coming forward with proof of the absence of any genuine issues of material fact." *Catrett v. Johns–Manville Sales Corp.,* 756 F.2d 181, 184 (D.C.Cir.1985). However, this court notes that in *Celotex,* the Supreme Court held that in cases where the non moving party will bear the burden of proof at trial on a dispositive issue (here the plaintiff), "a summary judgment motion may properly be made in reliance solely on the pleadings ... the burden on the moving party [here the defendants] may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's

case" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Furthermore, the Court reasoned;

> Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... *In such a situation, there can be "no genuine issues as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.*

*Id.* at 322–325, 106 S.Ct. at 2552–2554 (emphasis added).

In accordance with these established principles, the court's ruling in favor of the defendants is based primarily on the fact that plaintiff has failed to satisfy the initial burden of establishing the essential elements of his §§ 1981, 1982, 1983, and 3617 claims and, therefore, has not shown the existence of a genuine issue as to any material fact. The court will now briefly discuss its ruling in favor of defendants on their motions for summary judgment as pertaining to the above mentioned sections and Puglisi's failure to meet the burdens placed upon him under these sections and under summary judgment standards.

### 1. Section 1981 and 1982

In order for a plaintiff to prevail under § 1981, a plaintiff must allege and prove purposeful discrimination. *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989); *General Building Contractors Association v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Additionally, a plaintiff bears the initial burden of establishing a *prima facie case.* *Carter v. Duncan–Huggins, Ltd.,* 727 F.2d 1225, 1232 (D.C.Cir.1984).

There has been more litigation of cases brought pursuant to § 1981 than there has been of cases brought under § 1982. However, it is a well established principle that due to the "related origins and language of the two sections, they are generally con-

strued in pari materia." *Shen v. A & P Food Stores,* 1995 WL 728416 (E.D.N.Y.1995) (quoting *Choudhury v. Polytechnic Institute of New York,* 735 F.2d 38, 43 (2d Cir.1984)); *See also Tillman v. Wheaton–Haven Recreation Association, Inc.,* 410 U.S. 431, 440, 93 S.Ct. 1090, 1095, 35 L.Ed.2d 403 (1973) ("[I]n light of the historical interrelationship between s 1981 and s 1982 (there is) no reason to construe these sections differently . . ."); *McCrary v. Runyon,* 515 F.2d 1082, 1087 (4th Cir.1975) (both [s 1981 and s 1982] are subject to the same analysis and must be interpreted in the same light), *aff'd,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976). Accordingly, the court will apply the same standard to both sections.

■ To state a claim under either §§ 1981 or 1982, plaintiff must allege facts in support of the following elements: (1) [he is a] member of a racial minority; (2) defendant's intent to discriminate on the basis of [his] race, (3) the discrimination concerned one or more activities enumerated in ss 1981 or 1982, such as making or enforcement of contracts or the purchase and lease of property. *See Shen,* 1995 WL 728416 at 2; *Mian v. Donaldson, Lufkin & Jenrette Securities,* 7 F.3d 1085, 1087 (2d Cir.1993). Additionally, as the court's analysis of standing shows[24], a plaintiff does not have to be a member of the racial minority to bring a claim under these statutes, but can be a plaintiff alleging a personal injury derivative of defendant's discriminatory actions against a racial minority.

■ In applying the above principles to the procedural requirements of a summary judgment motion, plaintiff who alleges racial discrimination under the Civil Rights Acts has the initial burden of proving, by a fair preponderance of the credible evidence, a prima facie case of intentional discrimination. The burden then shifts to defendants to provide a legitimate, non discriminatory reason for its alleged action and then the burden shifts back to plaintiff to show that defendants' reasons are pretextual. *King v. Palmer,* 778 F.2d 878, 881 (D.C.Cir.1985); *Clifton Terrace Associates,* 929 F.2d at 722.

■ To withstand the motion for summary judgment, plaintiff must provide specific facts or evidence which establishes a basis for a reasonable inference that defendants' explanation is unworthy of credence. *Chauhan v. M. Alfieri Co.,* 897 F.2d 123, 127–128 (3rd Cir.1990). This burden-shifting framework is for the purpose of limiting the inquiry to possible legitimate reasons for defendant's actions and to exploring the ultimate issue of illegal racial motivation. It "was never intended to be rigid, mechanized, or ritualistic . . . [but] is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

Turning to the case before the court, in both of his complaints, Puglisi alleges all three elements of a prima facie case brought under §§ 1981 and 1982 as defined above. In his complaint against the Underhill defendants, Puglisi alleges that his claims arise out of defendants' action "in discriminating against the plaintiff with respect to housing opportunities on the grounds of the race of plaintiff's tenants," *see* Underhill Complaint ¶ 1, that defendants have combined, conspired and resultingly deprived him of his right to equal housing opportunity under 42 U.S.C. § 1982, and of his right to contract. *See Id.* at ¶¶ 28, 29.

In the complaint against the Village defendants, plaintiff alleges that defendants denied him the right to contract in violation of 42 U.S.C. § 1981, denied him the right of equal housing opportunities and the right to rent his premises without racial considerations in violation of 42 U.S.C. § 1982. *See Id.* at ¶¶ 1, 21, 22, 25. However, in evaluating the evidence in the light most favorable to Puglisi, although he may have alleged a prima facie case in his complaints, the court does not believe Puglisi has established a prima facie § 1981 or § 1982 case by any evidence to support those allegations. Nothing in the record can support a presumption or reasonable inference of defendants' intent to discriminate against Puglisi's three African

24. *See* discussion *supra,* Part II.A.

American tenants because of their race or against Puglisi for renting and contracting with the African Americans.

Puglisi alleges that the Underhill defendants, Ron Gallo, Marilyn Morgante and Robert DeMeo, formed the Underhill Taxpayer Association for the purpose of engaging in conspiratorial acts, contacted and invited him to a meeting at which they informed Puglisi of their discontent with his having rented to African American tenants, told him to evict the tenants and threatened to harass and continuously intimidate him until he did. Plaintiff alleges that when he refused to evict the tenants, the Association soon thereafter began filing false complaints of code and zoning violations at the 56 Underhill premises with the Village of Tuckahoe, spray painted or had spray painted 'nigger' on the same premises, and generally interfered willfully and maliciously with his rights as a landlord and the rights of his tenants.

Nothing in the record substantiates these allegations. Plaintiff has submitted no evidence which shows or even tends to show that the Underhill defendants were motivated by a racial animus in their actions or even that the defendants committed the alleged acts. As a matter of fact, at plaintiff's deposition, submitted by defendants in support of their motions, when questioned about the Underhill defendants forming the Association, holding meetings, inviting Puglisi and threatening him, plaintiff's responses were as follows:

Q. With regard to Mr. Gallo's phone conversation, did he identify Underhill Park Taxpayer Association?

A. Yes, he mentioned it.

Q. Did he ever tell you about the existence of an organization called the Underhill Park Taxpayer Association?

A. Yes.

Q. What, if anything, during that conversation did he tell you about this entity?

A. The two to three people that he wanted me to have a meeting with to discuss my property were the Underhill Park Taxpayer Association.

Q. Did he indicate whether there were other members of the Underhill Park Taxpayer Association?

A. Yes.

Q. Did he identify them?

A. No.

Q. Did he, during this conversation, indicate to you what purpose, if any, that the Underhill Park Taxpayer Association had with meeting with you?

A. To discuss my property.

Q. Did Mr. Gallo identify himself as being an officer or an agent of the Underhill Park Association?

A. No.

Q. After you spoke to Mr. Gallo in the conversation you have described about the meeting and the Underhill Park Taxpayer Association, did you ever have occasion to have conversation with anybody else concerning Underhill Park Taxpayer Association; that is, after the conversation with Mr. Gallo up to the present day?

A. I ran the theory or the idea across with the Village clerk ... and she said she had no knowledge of it ... I think I asked two or three neighbors and they had no knowledge of it.

Q. Returning if I may, to the events following the telephone conversation you had with Mr. Gallo about attending a meeting with this Underhill Park Taxpayer Association, you indicated that you did not attend, is that correct ...?

A. Correct.

Q. Do you have any knowledge as to whether an organization known as Underhill Park Taxpayer Association ever held meetings between the period of 1991 and November of 1993?

A. I have no knowledge of that.

Q. To your knowledge, are you aware, from the period 1990 through 1991, of any meetings between Mr. Gallo, Mr. DeMeo, Ms. Morgante or any other persons involving your ownership or your actions at 55 or 56 Underhill Street?

A. No, not to my knowledge.

Defendant Gallo, accused of being a founder and conspirator of the Association and of

holding meetings with the other defendants, seemed like the plaintiff, to have little knowledge of the Association, its existence or purpose.

Q. Did you ever have any conversations with any of your neighbors on Underhill Street about John Puglisi or his properties?

A. Yes ... Robert DeMeo ... we were discussing a house on Scarsdale Avenue that had recently burned to the ground. A story, I believe, was in the paper, said that teenagers had gotten into this house. It was unoccupied, and they were being vandalists and the house caught fire and burned to the ground ... I said to him that I was speaking to a fellow on the block named Austin McKeand. He informed me that 55 Underhill Street had not been occupied for more than 50 years ... the thought came into our heads that this could happen on our block. This incident on Scarsdale Avenue could happen on our block.

Q. In what context did you ever hear of the Underhill Park Taxpayer Association?

A. First time I ever heard of it was when I read it on the lawsuit papers signed by you, signed by Ms. Baily.

Q. Did you ever attend a meeting at which Mr. DeMeo and Ms. Morgante were also present, at which John Puglisi's property was the subject discussed?

A. I don't recall anyone other than Mr. DeMeo and myself discussing it.

See Gallo Transcript p. 14, 34. Defendant DeMeo's responses at his deposition [25] were very similar:

Q. Do you know what the Underhill Park Taxpayers Association is?

A. No.

Q. Did you ever ask anyone what the Underhill Taxpayers Association was?

A. I don't recall.

Q. Did you ever speak to Mr. Gallo about the Underhill Taxpayer's Association?

A. No, I don't recall that.

Q. Did you ever speak to Ms. Morgante about the Underhill Park Taxpayer's Association?

A. I don't recall that.

Q. Did you attend a meeting of the Underhill Park Taxpayers Association?

A. I don't recall that.

See DeMeo Transcript p. 38–39. Plaintiff has provided no proof of the Association's existence, its members, its purpose, or the identity of its members. Plaintiff has alleged quite the opposite in his complaint; however, once a party has moved for a summary judgment, the non moving party cannot rest on mere allegations. *Clifton Terrace Associates,* 728 F.Supp. at 31. (plaintiff may not rely on mere speculation at this juncture but must set forth "affirmative evidence" of the existence of a genuine issue for trial) (quoting *Anderson,* 477 U.S. at 256–257, 106 S.Ct. at 2514–2515). In actuality, plaintiff refutes his own allegations by stating in his deposition that he did not attend the meeting, the very meeting where all defendants were allegedly present and threatening to retaliate against him for not evicting his tenants.

With respect to plaintiff's allegations that the Association filed false complaints, Ron Gallo admits to writing a petition in regards to plaintiff's vacant premises at 55 Underhill Street [26], had members in the neighborhood sign it, including defendant DeMeo, and submitted it to the Village of Tuckahoe. In both of defendants' depositions and in plaintiff's deposition, there seems to be ambiguity as to whether this petition was titled "Underhill Taxpayer Association." In their depositions, neither defendant could recall if the petition was so titled but defendant DeMeo seemed to admit that to his recollection it was.

Furthermore defendant Gallo admits that he called the Building Department, specifically Village defendant Richard Carroll, the building inspector, to complain of electrical work he thought was being done at the 55

---

**25.** The other named defendant Marilyn Morgante did not take a deposition due to illness.

**26.** Plaintiff stated at his deposition that the premises were not vacant in that he used them

on a transitory basis which he explained as using the premises as storage and using it to invite friends over to show and sell some of his deceased mother's antiques.

Underhill premises without a permit. Likewise, Underhill defendant Morgante admits to questioning a Con–Edison representative who was doing work at the 55 Underhill premises. In viewing the evidence most favorable to Puglisi, this information in and of itself is not sufficient evidence to support an inference of intent to discriminate against the plaintiff and his tenants because of the race of these tenants even when coupled with the allegation that defendant DeMeo approached and threatened Puglisi.

Assuming that there was an Underhill Taxpayer Association and that the Association through Gallo filed the complaint regarding the alleged vacant building with the Building Department and the Mayor's office, as plaintiff alleges and speaks to in his deposition [27], the complaints were in regards to 55 Underhill Street, premises that were not the subject of Puglisi's complaint nor the premises in which the African American tenants resided and were allegedly being forced to vacate due to these false complaints.

Moreover and more importantly, none of these actions show that the Underhill Defendants were filing these complaints because of racial animus against Puglisi's tenants. The evidence does not support such a presumption. Defendant Gallo, the alleged instigator, has four African American tenants living in his 58 Underhill premises. It would not be reasonable for a jury to infer, without more evidence, that Gallo organized against Puglisi for renting to African American tenants when he, himself, rents to four African American women who, the court notes, submitted affidavits and attended the hearing on the motions for summary judgment to contest the allegations of racial discrimination of defendant Gallo. It is not reasonable to infer also that defendant DeMeo would join an Association with a member who was renting to African American tenants if he had such a strong dislike of landlords renting to African Americans in the community.

**27.** Puglisi stated in his deposition that he had received several oral complaints from residents in the neighborhood complaining about the potential dangers to children of 55 Underhill Street particularly in regards to his leaving an unat-

## 2. Section 1983

Section 1983 does not provide relief for all constitutional injuries only for those injuries caused by persons who are state actors or acting "under color" of state law. *Annunziato, et al., v. The Gan, Inc.,* 744 F.2d 244 (2d Cir.1984); *Rendell–Baker v. Kohn,* 457 U.S. 830, 835, 102 S.Ct. 2764, 2768, 73 L.Ed.2d 418 (1982); *Flagg Bros., v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1948). The "under color" of law requirement of § 1983 has been viewed in the same manner as the "state action" requirement of the Fourteenth Amendment. *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966) (In § 1983 claims, as in Fourteenth Amendment claims, the question is whether the infringement of rights is attributable to the state); *See also Lugar v. Edmondson Oil Company,* 457 U.S. 922, 928, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 483 (1982) (state action and under color of law are obviously related even if not completely identical).

To state a claim under § 1983, plaintiff must allege and show defendants acted 'under color' of law and deprived him of rights guaranteed under the Constitution and federal laws. "Acting 'under color' of state law is defined as the 'misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961) (quoting from *United States v. Classic, supra,* 313 U.S. [299] at 326, 61 S.Ct. [1031] at 1043 [85 L.Ed. 1368 (1941)]). *Annunziato,* 744 F.2d at 249. Showing involvement of a state official in the violation of plaintiff's constitutional or federally protected rights satisfies the requirement of state action or acting under color of law. *See, Adickes* 398 U.S. at 152, 90 S.Ct. at 1605–1606.

Furthermore, courts have held that the state action under color of law requirement of § 1983 is not confined to the actions of a state officer but reaches the activities of pri-

tended ladder up against the wall of the premises. However, he mentioned the one written complaint he saw was on file at the Village Department and the Mayor's office and entitled "Underhill Taxpayer's Association".

vate parties when the private party is "a willful participant in joint activity with the state or its agents." *Id.; Conrad v. Perales*, 818 F.Supp. 559 (W.D.N.Y.1993). Plaintiff must establish that there was a:

> 'meeting of the minds', 'conspiracy', 'preconceived plan', or 'mutual understanding' or 'concerted action'. *Scott v. Greenville County*, 716 F.2d 1409, 1424 (4th Cir.1983) (conspiracy claim under s 1983 between private defendants and public officials was not shown either by private defendants' attempts to influence action of County Council or by their intervention into the lawsuit); *Fonda v. Gray*, 707 F.2d 435, 439 (9th Cir.1983) (s 1983 claim fails without "evidence of the existence of a 'meeting of the minds' between [private and government defendants] to knowingly attempt to accomplish an alleged wrongful purpose"; *Norton v. Liddel*, 620 F.2d 1375, 1379 (10th Cir.1980) (claim stated under s 1983 where private individual "actively conspires" with the intent purposely and knowingly to deprive an individual of his rights under the Constitution)); *Alexanian v. New York State Urban Development Corp.*, 554 F.2d 15, 17 (2d Cir.1977) (per curiam) (s 1983 "concerted action" claim stated where plaintiff alleged that private citizen struck him with his car and then had him arrested and threatened by police that unless he withdrew his charges against the driver, charges would be pressed against him for jumping on the hood of the car).

*Annunziato*, 744 F.2d at 251.

In this case, Puglisi alleges that the Village defendants through its agents conspired with the Underhill defendants to harass him for renting to African Americans and acted under color of law by misusing its power to selectively enforce the Village of Tuckahoe's building codes and regulations against him in violation of his rights to the equal protection of the laws. Puglisi alleges that the Village defendants were motivated by racial animus. However, Puglisi's equal protection claim is not a challenge to the Village of Tuckahoe codes and regulations but is a challenge to the "selective enforcement" of these codes and regulations.

Although there are few cases in this emerging area of law, the Second Circuit has held that to bring such a claim, plaintiff must establish or present sufficient evidence for a reasonable inference to be drawn that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609 (2nd Cir.1980). The Court ruled that "if defendants employed their official powers for the purpose of injuring the plaintiff, rather than to serve the proper ends of their government duties, plaintiff might well have a claim under the civil rights statutes." *Id.* (quoting *Moran v. Bench*, 353 F.2d 193, 194 (1st Cir.1965), *cert. denied*, 384 U.S. 906, 86 S.Ct. 1341, 16 L.Ed.2d 359 (1965)). As with his §§ 1981 and 1982 claims, this court finds that Puglisi has provided scant evidence to support his allegations of that the Village defendants' misuse of power via conspiratorial activity or selective enforcement which are essential elements of a § 1983 claim.

Again, in the record before the court, it does not appear that the Village defendants' actions were beyond their authority, or that their conduct was arbitrary or unreasonable. The Village defendants have provided sufficient evidence to show their legitimate reason for issuing the various code and zoning violations at the 56 Underhill premises. The plaintiff has not submitted any evidence nor pointed to any specific facts which would contradict defendants' explanation or would expose the offered explanation as pretextual and unworthy of credence. Because of this failure to prove the Village defendants actions were a misuse of power granted them as officers of the state, plaintiff has failed to prove the second prong of his selective enforcement claim which requires a showing that defendants selectively enforced its codes and regulations based on impermissible consideration like race, a factor that plaintiff claims was the determining factor in defendants enforcement of Village codes at the 56 Underhill building due to the race of the African American residents.

The record supports the conclusion that the Village defendants, particularly through defendant Richard Carroll, enforced its codes and cited plaintiff as violating building code regulations when, during the time of the tenancy of the three African American tenants, sewage began to overflow from the premises onto the public sidewalk and street. When asked to define raw sewage, plaintiff commented raw sewage included both toilet and kitchen waste. The overflow continued for at least two days. Village defendant Carroll contacted plaintiff on a few occasions in regards to the condition and when it was thoroughly corrected, Carroll inspected the condition and cleared it as satisfactory.

According to plaintiff, defendant Carroll came to inspect the premises again due to allegations from Village defendant Gallo of major construction being done on the premises and of the premises being used as an illegal boarding house. Puglisi refused to grant Carroll entrance even after a letter from the Village building department ordered him to allow Carroll to inspect the premises. At the deposition, plaintiff explained the reason for his refusal was because the 56 building was not being used as a boarding house nor was construction work being done at the premises. Puglisi later admitted on his deposition that he was doing construction but that it was nothing major, just some painting, plastering, wallpapering, possible roofing, fixing of pipes due to leaky valves and dripping from the ceiling and cellar floor, replacing of sinks, and installation of stove and tiling. See Puglisi Transcript p. 158–160. Plaintiff explained in doing the 'minor' construction work he was not aware that he needed a building permit for these jobs and admitted that he made no inquire to either the building department or an attorney.

Subsequently, plaintiff admitted that there were a series of inspections and of issuances of building code violations in regards to both the 55 and 56 Underhill premises. Furthermore, he asserted that the Village of Tuckahoe building department asked him to sign a stipulation of guilt and to evict the tenants in return for a cease and desist of further violations being entered against him. Because of the financial and emotional strain of the Village defendants persecution, Puglisi explained his signing of the stipulation without the statement of guilt and his subsequent, eviction of the tenants. See Puglisi Transcript p. 324–327. Plaintiff contends that the Villages offer and eviction requirement made him suspicious of the Village defendants' motivation and possible selective enforcement of the building codes due to the race of the tenants.

Although Puglisi mentions one other person similarly situated with conditions on her premises identical to his and who was not subject to inspections and code violations, this in and of itself is insufficient to make out a § 1983 claim under a selective enforcement theory. *LeClair*, 627 F.2d at 608 ("[M]ere failure to prosecute other offenders is not a basis for a finding of denial of equal protection"); *Zahra v. Town of Southold*, 48 F.3d 674, 684 (2d Cir.1995) (just because plaintiff was cited for possible violations and other business were not does not by itself, establish a malicious or bad faith basis).

In regards to the offered stipulation of guilt for certain code violations, the Building Department obviously did not feel the premises were habitable and gave Puglisi the opportunity to avoid further costs to himself by asking him to evict the tenants until the necessary renovation and repairs were done. None of these actions of the Village defendants are evidence of racial animus. As a matter of fact, one of the tenants that was asked to leave the premises was not an African American but was a Caucasian male who had replaced one of the African American tenants earlier that year. Evidence shows that even after the African American and Caucasian tenants were evicted, Puglisi was cited for other code violations in 1992 and 1993 up until 1994, when he was brought up on criminal charges in the Village justice court in connection with the violations. See Village defendants' exhibits I, J, and K.

The evidence does not support a presumption of Village defendants' selective enforcement of its codes due to the impermissible consideration of the race of Puglisi' tenants since one of the tenants evicted was not an African American and the citations continued

after the eviction of the tenants. The only inference to be drawn from the record is that the house was in bad condition after 100 years of wear and tear and needed substantial repair. Despite the fact that plaintiff alleges bad faith on the part of the Village defendants, the evidence simply does not support this allegation. What the evidence shows is that Village defendant Richard Carroll and the Village of Tuckahoe fulfilled the duties of inspecting buildings and making sure they do not pose a threat to the general public.

In regards to the spray painting of the derogatory word on his premises, nothing in the record supports Puglisi's allegation that he was denied equal protection in that the Village defendants' failed to make a thorough examination or inquiry into the incident or encouraged or created the environment for the ugly occurrence to occur in the first place. An affidavit of Mr. Yancy, an African American who was on the Village Board of Trustees, attests to a thorough examination and submits the write up that followed the investigation which also indicates that the incident was reported to the local police. Furthermore, plaintiff states that he and the Department of Justice investigated the incident and, like the Village Board of Trustees, could not identify the perpetrators.

Lastly, the court finds no evidence of a conspiracy between the Underhill and Village defendants to deprive plaintiff of equal protection of the laws. As the court has already found the Village defendants' actions valid, the court will only note that "while the Court is required to assume the truth of specific factual allegations, mere conclusory or "general allegations of cooperation" between private individuals and specific state agents do not make out a claim of action taken under color of state law." *Singer v. Bell*, 613 F.Supp. 198 (S.D.N.Y.1985). Plaintiff uses the word 'conspiracy' several times in his complaint but the facts only show that Underhill defendant, Ron Gallo, met with the Village of Tuckahoe Board of Trustees and the Mayor, Philip White, to discuss the premises at 55 Underhill, its dangers and the petition to close down the vacant building,

not the 56 Underhill building nor its residents.

In his deposition, Puglisi admits that he does not know whether the Underhill defendants and the Village defendants ever met to discuss his 56 Underhill property. While the court acknowledges that a conspiracy is often difficult to prove and that the court, may at times, have to rely on circumstantial evidence of a conspiracy, "there are legal limitations upon the inferences which may be drawn from circumstantial evidence." *Matsushita Elec. Ind. Co. v. Zenith Radio Corporation*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Scolnick v. Lefkowitz*, 329 F.2d 716 (2d Cir.1964) ("[N]evertheless, by the bare use of the word 'conspiracy,' with no supporting facts that tend to show the existence of an unlawful agreement or prima facie improper behavior, plaintiff has not met the burden of countering affidavits making such explicit denials"). The evidence, be it direct or circumstantial, does not support a finding of conspiracy between the Underhill defendants and Village defendants.

The court finds that plaintiff has not, combined with his failure to show that the Village defendants acted improperly, established the essential elements of a § 1983 claim and grants defendants' motions.

### 3. Section 3617

By creating the Fair Housing Act, Congress manifested the strong intent of severely limiting public or private conduct that prevents racial minorities from obtaining decent and available housing on account of their race. This section of the Act has been interpreted to provide relief to the protected class and those who aid or encourage the protected class in exercising their rights. *Stackhouse v. DeSitter*, 620 F.Supp. 208 (N.D.Ill. 1985); *Frazier v. Rominger*, 27 F.3d 828 (2d Cir.1994). The language of this section is clear. To state a claim, Puglisi must allege and show that defendants engaged in the prohibited conduct of coercing, intimidating, threatening or interfering with him and his right to aid or encourage his African American tenants in the exercise of their rights under the Act. Plaintiff uses the conclusory language of the statute "coerce, intimidate,

threaten and interfere" in his complaint, but as has been discussed in this opinion, he provides no evidence to support these conclusory allegations of such conduct based on race. Therefore, this court also dismisses this claim, pursuant to defendants summary judgment motion, due to plaintiff's failure to establish the essential elements of this section.

### B. Plaintiff's Supplemental State Law Claim

Plaintiff's seventh and eighth claims in the Underhill complaint were brought pursuant to the Human Rights Law of the State of New York. Since plaintiff's Civil Rights claims and Fair Housing Act claims are dismissed, plaintiff's state law claim is dismissed as well, pursuant to 28 U.S.C. § 1367(c). *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Maric v. St. Agnes Hospital Corporation*, 65 F.3d 310, 314 (2d Cir.1995).